109 T.C. No. 2


UNITED STATES TAX COURT


HOSPITAL CORPORATION OF AMERICA AND SUBSIDIARIES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 10663-91, 13074-91,      Filed July 24, 1997.
            28588-91,  6351-92.



        Ps own, operate, and manage hospitals and related
    businesses.  For taxable years ended 1985 through 1987
    Ps claimed depreciation deductions based on 5-year
    recovery periods for certain properties they placed in
    service during those years, which properties Ps claim
    constitute tangible personal property.  R determined
    that the properties constitute structural components of
    the buildings to which they relate and that the
    properties therefore must be depreciated over the same
    recovery periods as those buildings.
        Held:  For purposes of assigning appropriate
    recovery classes or recovery periods to the properties
    to determine allowable depreciation deductions pursuant
    to sec. 168, I.R.C., tests developed under prior law
    for purposes of the investment tax credit are
    applicable to decide whether the property constitutes
    tangible personal property.

Held further: The prohibition contained in sec. 168, I.R.C., against the use of the component method of depreciation does not preclude the use of an analysis based on Scott Paper Co. v. Commissioner, 74 T.C. 137 (1980), and its progeny, and sec. 1.48-1(1), Income Tax Regs., and accordingly such authorities are applied to assign appropriate recovery classes or recovery periods to the properties in issue.

N. Jerold Cohen, Randolph W. Thrower, J.D. Fleming, Jr., Walter H. Wingfield, Stephen F. Gertzman, Reginald J. Clark, Amanda B. Scott, Walter T. Henderson, Jr., William H. Bradley, and John W. Bonds, Jr., for petitioners in docket No. 10663-91.

N. Jerold Cohen, Randolph W. Thrower, J.D. Fleming, Jr., Walter H. Wingfield, Stephen F. Gertzman, Reginald J. Clark, Amanda B. Scott, Walter T. Henderson, Jr., William H. Bradley, John W. Bonds, Jr., and Daniel R. McKeithen, for petitioners in docket No. 13074-91.

N. Jerold Cohen, Walter H. Wingfield, Stephen F. Gertzman, Amanda B. Scott, Reginald J. Clark, Randolph W. Thrower, Walter T. Henderson, Jr., and John W. Bonds, Jr., for petitioners in docket No. 28588-91.

N. Jerold Cohen, Reginald J. Clark, Randolph W. Thrower, Walter T. Henderson, Jr., and John W. Bonds, Jr., for petitioners in docket No. 6351-92.

Robert J. Shilliday, Jr., Vallie C. Brooks, and William B. McCarthy, for respondent.

WELLS, Judge: These cases were consolidated for purposes of trial, briefing, and opinion and will hereinafter be referred to as the instant case.[1] Respondent determined deficiencies in petitioners' consolidated corporate Federal income tax as follows:

| TYE | Deficiency |
|------|------------|
| 1978 | $2,187,079.00 |
| 1980 | 388,006.58 |
| 1981 | 94,605,958.92 |
| 1982 | 29,691,505.11 |
| 1983 | 43,738,703.50 |
| 1984 | 53,831,713.90 |
| 1985 | 85,613,533.00 |
| 1986 | 69,331,412.00 |
| 1987 | 294,571,908.00 |
| 1988 | 25,317,840.00 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all

---

[1] The instant case involves many issues, some of which have been settled or decided. The issues remaining for decision involve matters falling into two reasonably distinct categories, which the parties have denominated the MACRS depreciation issue and the captive insurance or Parthenon Insurance Co. issues. The MACRS depreciation issue was presented at a special trial session with two other distinct categories of issues that we previously decided, and the captive insurance issues were severed for trial purposes and were presented at a subsequent special trial session. Separate briefs of the parties were filed for each of the distinct categories of issues. We decided tax accounting issues in Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1996-105; Hospital Corp. of Am. v. Commissioner, 107 T.C. 73 (1996); and Hospital Corp. of Am. v. Commissioner, 107 T.C. 116 (1996). We decided an issue related to the sale of the stock of certain subsidiaries to HealthTrust, Inc.--The Hospital Company in Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1996-559. The Parthenon Insurance Co. issues will be addressed in a separate opinion subsequently to be released. The instant opinion involves the MACRS depreciation issue.

Rule references are to the Tax Court Rules of Practice and Procedure.

The issues to be decided concern the appropriate recovery classes (for tax years ended 1985 and 1986) or appropriate recovery periods (for tax years ended 1987 and 1988) for certain tangible property that petitioners placed in service during those years. To decide whether petitioners utilized the proper recovery classes or periods in calculating their claimed depreciation deductions for those taxable years, we must decide (1) whether the tests developed under prior law for purposes of the investment tax credit are applicable, and, if so (2) whether the respective properties constitute section 1245 personal property or section 1250 real property pursuant to those tests.

## FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91. The parties' stipulations of fact are incorporated herein by reference and are found as facts in the instant case.

Petitioners were members of an affiliated group of corporations whose common parent was Hospital Corporation of America (HCA), which was incorporated under the laws of the State of Tennessee.[2] HCA maintained its principal offices in

---

[2] On Feb. 10, 1994, HCA was merged with and into Galen Healthcare, Inc., a subsidiary of Columbia Healthcare Corp. of Louisville, Kentucky, and the subsidiary changed its name to HCA-Hospital Corp. of America. On that same date, the parent changed
(continued...)

Nashville, Tennessee, on the date the petitions were filed. For each of the taxable years involved in the instant case, HCA and its domestic subsidiaries filed a consolidated Federal corporate income tax return (consolidated return) on Form 1120 with the Director of the Internal Revenue Service Center at Memphis, Tennessee.

Petitioners' primary business is the ownership, operation, and management of hospitals. In Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1996-105, we set forth a detailed description of petitioners' hospital operations, which will not be reiterated here. We incorporate herein our findings of fact contained in that Memorandum Opinion.

During the taxable years in issue, petitioners constructed a number of hospital facilities. Those hospital facilities consist generally of 10 different categories, which the parties denominate as follows: (1) Large Medical/Surgical Facilities; (2) Small Medical/Surgical Facilities; (3) Ancillary Facilities; (4) Radiology Facilities; (5) Small Psychiatric Facilities; (6) Large Psychiatric Facilities; (7) Obstetrics Facilities; (8) Ambulatory Surgery Facilities; (9) Patient Bed Facilities; and (10) Ancillary II Facilities.

On their tax returns for taxable years ended 1985, 1986, and 1987, petitioners classified as tangible personal property

---

2 (...continued)
its name to Columbia/HCA Healthcare Corporation.

certain items relating to hospital facilities constructed during those taxable years, and claimed the investment tax credit (ITC),[3] and depreciation deductions using a 5-year recovery period. Respondent, however, determined in the notice of deficiency that a number of those items were structural components of the related buildings and not personal property, that those items were not eligible for ITC, and that they must be depreciated over the same recovery period as the buildings to which they related. Prior to trial, the parties resolved the ITC issue, leaving for trial the issue of the proper classification of the property items for purposes of claiming the depreciation deduction for the taxable years in issue.

On their tax returns for taxable years ended 1987 and 1988, petitioners classified as tangible personal property certain items relating to hospital facilities constructed during those years and claimed depreciation deductions using a 5-year recovery period. Respondent, however, determined in the notice of deficiency that a number of those items were structural components of the related buildings and that they must be depreciated over the same recovery period as the buildings to which they related.

---

[3] The investment tax credit (ITC) was repealed by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 211(a), 100 Stat. 2166, effective (subject to transition rules) for property placed in service after Dec. 31, 1985.

All of the property items in issue (disputed property items) were installed in hospitals constructed for petitioners pursuant to contracts with general construction contractors during taxable years ended 1985, 1986, 1987, and 1988. The parties have agreed as to the proper categorization and the total construction cost of each facility, the cost bases of the particular disputed property items,[4] and the dates on which each of the facilities (and the property items located therein) were placed in service. The parties have agreed to procedures to be followed to implement our decision once we decide the appropriate recovery classes (or recovery periods) for the disputed property items.

The parties have designated one facility to serve as a "representative facility" for each of the 10 different categories of hospital facilities. The parties agree, however, that the property items in petitioners' hospital facilities are identical to each other in all material respects (i.e., manner of

---

[4] For convenience, the parties have assigned various property unit numbers to the disputed property items. The parties defined and identified property units to include all functionally or structurally related items. Property units are categorized as either item property units or group or system property units. From time to time we refer to the disputed property items by their assigned property unit numbers.

attachment, function, construction, and design) regardless of the
facility in which they are contained.

Description of the Disputed Property Items[5]

---

[5]    On brief, petitioners group the disputed property items into
categories denominated as follows:  Primary and secondary
electrical distribution systems (Property Unit 1900); branch
electrical wiring and connections and special electrical
equipment (Property Units 2200, 2244, 2320, 3026, 3075, 3195,
3280, 3292, 3298, 4040); branch electrical wiring, connections
and receptacles relating to television equipment (Property Unit
2340); conduit, floor boxes, power boxes, and outlet jacks
relating to telephone equipment (Property Unit 2330); electrical
wiring, conduit, and connections relating to internal
communications systems (Property Unit 3090); carpeting (Property
Unit 2140); vinyl wall coverings (Property Unit 2380); vinyl
floor coverings and special purpose sheet vinyl (Property Unit
2370); kitchen water piping (Property Unit 3080) and kitchen
equipment steam lines (Property Unit 3070); special plumbing
connections relating to x-ray equipment (Property Unit 2244);
kitchen hoods and exhaust systems (Property Unit 3085); patient
corridor handrails (Property Unit 3190); overbed lights and
related electrical connections (Property Unit 4050); accordion
doors/partitions (Property Unit 3240); bathroom accessories and
partitions (Property Unit 2360) and plastic mirrors (Property
Unit 2385); acoustical tile ceilings (Property Unit 2260); and
steam boilers and related accessories (Property Unit 3193).  On
brief, respondent groups the disputed property in a similar
manner except that respondent separates the property items
petitioners included in Property Units 2200, 2244, 2320, 3026,
3075, 3195, 3280, 3292, 3298, 4040 (disputed property items
relating to branch electrical wiring, etc.), Property Unit 2330
(disputed property items relating to telephone equipment),
Property Unit 2340 (disputed property items relating to
television equipment), and Property Unit 3090 (disputed property
items relating to internal communications systems) into
individual categories of conduit; electrical wiring; and
electrical outlets, receptacles, and junction boxes.
Additionally, respondent combines the property items petitioners
included in Property Units 3080 and 3070 (kitchen water piping
and kitchen equipment steam lines) and Property Unit 2244
(plumbing connections relating to x-ray equipment) into one
category of plumbing.  We adopt generally in the instant opinion
the denomination of categories utilized by petitioners.

1. <u>Primary and Secondary Electrical Distribution Systems</u>

The primary electrical distribution systems,[6] which the parties have designated as Property Unit 1900, accept electricity from outside electrical power sources and deliver it to the secondary electrical distribution systems contained within the hospital facilities.  Generally, the items comprising the primary electrical distribution systems consist of (1) the electrical wire and conduit extending from the outside power sources to the main electrical distribution panels and (2) the main electrical distribution panels themselves, also known as main switchgears. In some instances, motor control centers or transformers also may be included.

The secondary electrical distribution systems receive electricity from the primary electrical distribution systems and deliver it to the various electrical end-users located throughout petitioners' hospital facilities (e.g., lighting fixtures, fire protection systems, and hospital equipment).  The items comprising those secondary electrical distribution systems consist of the electrical wire and conduit extending from the primary electrical distribution panels to the secondary electrical distribution panels, the secondary electrical

---

[6]    Respondent agrees that the items comprising petitioners' primary and secondary electrical distribution systems are similar to those items in issue in <u>Morrison, Inc. v. Commissioner</u>, T.C. Memo. 1986-129, affd. 891 F.2d 857 (11th Cir. 1990).

distribution panels themselves, and any transformers located between the primary electrical distribution panels and the secondary electrical distribution panels.

The main switchgears and the motor control centers are steel cabinets which are attached to concrete pedestals using nuts that are tightened onto bolts extending out of the pedestals. Transformers have a construction similar to that of the switchgears and the motor control centers and are either attached to concrete pedestals in a manner similar to the switchgears and the motor control centers or suspended from the overhead structural framework of the hospital buildings using threaded rod hangers. Screws or bolts attach the electrical panels to the walls of the buildings.

The main panel and the main motor control centers range in size from 91.5 inches high by 40 inches wide by 20 inches deep up to 91.5 inches high by 60 inches wide by 20 inches deep. The main panel is equal to or larger in size than the motor control centers. The conduit from the main transformer to the main switchboard is 42 inches underground and encased in a concrete envelope.

The components of the primary and secondary electrical systems are similar in nature, although they vary in size and complexity depending on the various electrical loads carried by them. Those components are installed during the construction

phase by the electrical subcontractor. The conduit and wire in both the primary and secondary electrical distribution systems are custom fit for the initial place of installation.

The electrical wire constitutes the conductor used to carry electrical power from the primary electrical distribution systems to the secondary electrical distribution systems and from the secondary electrical panels to various branch wiring items (e.g., circuit breakers, fuses). The electrical wire carries electrical power to the secondary electrical panels and the branch circuits for individual electrical loads.

Electrical wire is installed in electrical conduit. Electrical conduit is typically aluminum, plastic, or galvanized tubing or piping which is custom fit for the particular application. Electrical conduit may be attached to the structures of the hospital buildings using screws and brackets or other appropriate fasteners. Electrical conduit serves as a protective shield for electrical wire contained inside the conduit and provides a pathway for the wire to travel from one location to another. The conduit is integrated into a building during the construction phase and is generally attached to ceilings, floors, and walls, or encased in concrete. Conduit may be inaccessible or hidden behind surfaces. Conduit commonly is abandoned in place and not reused when a particular item of equipment to which it relates is moved or retired.

Although not a common occurrence, petitioners have moved and reused some items (e.g., electrical panels, transformers, and motor control centers) in connection with remodeling projects. Workers started and completed the task in one evening. The items were not damaged by being moved from one location within the hospital to another, and after they were moved, the items functioned in the same manner as they had prior to being moved.

The parties have stipulated that the percentage of the electrical load carried by the primary and secondary electrical distribution systems to hospital equipment is as follows:

| Type of facility | Percentage |
|---|---|
| Large Medical/Surgical | 30 |
| Small Medical/Surgical | 36 |
| Small Psychiatric | 23 |
| Large Psychiatric | 26 |

The balance of the electrical load is carried to items related to the operation or maintenance of petitioners' buildings.

2. Branch Electrical Wiring and Connections and Special Electrical Equipment

a. In General

The branch wiring in the subject category is the wiring that extends from the secondary distribution panels to either a duplex outlet at or in a wall surface, or, in instances where a piece of machinery is "hardwired",[7] to a junction box mounted on or within

---

[7] When equipment is "hardwired", the wiring connection of that equipment is attached and secured directly to the electrical

(continued...)

a surface of the building.  The branch electrical wiring and connections consist of conduit, wiring, and electrical connections which relate to particular items of hospital equipment.  Specifically, the items of hospital equipment to which the branch electrical wiring and connections in the subject category relate are:  (a) The emergency power generator controls, battery packs, and battery chargers (Property Unit 2200); (b) the x-ray film processing equipment (Property Unit 2244); (c) the illuminated front entrance signs and emergency entrance signs (Property Unit 2320); (d) the medical gas control equipment and the medical gas alarm equipment (Property Unit 3026); (e) kitchen equipment (e.g., braising pans, sanitizers, deep fryers, toasters, ice makers/dispensers, and heat lamps) (Property Unit 3075); (f) equipment located in the hospital laboratories and maintenance shop areas, such as tools and welding equipment, specimen slicers, etc. (Property Unit 3195); (g) the synchronously wired clock systems (Property Unit 3280); (h) the air conditioners located in the hospital computer rooms (Property Unit 3292); (i) the central sterilization equipment (Property Unit 3298); and (j) special electrical equipment located in the hospital operating rooms, recovery rooms, intensive care units, infant nurseries, radiology areas, patient rooms, and

---

[7] (...continued)
wiring in a junction box.

laboratories (Property Unit 4040).  Items of equipment for which electrical connections are wired directly to the hospitals' electrical systems include the front entrance sign, the emergency entrance sign, the air conditioner for the computer equipment, and the central sterilization equipment.

The branch electrical wiring and connections are required for the operation and use of the equipment to which they relate. The branch electrical wiring and connections are used only with the items of equipment to which they relate.[8]

All of the electrical load carried by the branch electrical wiring and connections is carried to the particular items of equipment to which they relate.  The conduit protects and houses the wiring.

b.  Wiring and Related Property Items Relating to Kitchen Equipment (Property Unit 3075)

The disputed property items in Property Unit 3075 consist of wiring, conduit, junction boxes, and outlets that provide electricity required for the operation and use of hospital kitchen equipment, including the kitchen hood fans and lights, braising pans, sanitizers, deep fryers, toasters, ice makers/dispensers, coffee urns, milk and ice cream dispensers, and heat lamps.  Those items are used only with the hospital

---

[8]   The parties agree that the items of equipment to which the branch electrical wiring and connections in issue relate are properly depreciable over 5-year periods.

kitchen equipment.  If necessary, some of the items could be adapted for another use.  In most instances, the items run from the hospitals' secondary electrical distribution systems to a wall near the equipment which they are intended to service.

      c.   <u>Wiring and Related Property Items in the Laboratory and Maintenance Shop (Property Unit 3195)</u>

The disputed property items in Property Unit 3195 consist of wiring, conduit, above-counter receptacles, circuit boxes, and plugmoldings which make electricity available in the laboratory and maintenance shop areas of the hospitals and provide localized electrical power for various electrical end-users located in those areas.[9]  Some of the items described in Property Unit 3195 are located in the walls between the hospitals' secondary electrical distribution systems and either electrical outlets or the particular equipment they are intended to serve.  If necessary, some of those items could be adapted for another use.

      d.   <u>Wiring and Related Property Items in Other Areas of the Hospitals (Property Unit 4040)</u>

The disputed property items in Property Unit 4040 consist of wiring, conduit, outlets, circuit boxes, and related electrical isolation panels which make electricity available for the operation and use of equipment located in the intensive care

_____

[9]   Other wiring, conduit, receptacles, and junction boxes, which are not contained in Property Unit Number 3195 but which the parties agree relate to the operation and maintenance of the hospitals' buildings, also make electrical power available in the laboratory and maintenance shop areas.

units, operating rooms, recovery rooms, infant nurseries, patient rooms, radiology areas, laboratories, and kitchens.  The isolation panels and grounding receptacles ensure that the medical equipment receiving electrical power from the isolated electrical circuits does not leak electricity, which could shock patients undergoing surgery or other forms of treatment.  The remote grounding receptacles are necessary for the common grounding of equipment in those areas of the hospitals and are necessary for the operation of the isolation panels.

 3. Wiring and Related Property Items Relating to Television Equipment (Property Unit 2340)

Disputed property items in Property Unit 2340 consist of branch electrical wiring, conduit, junction boxes, outlet receptacles, and equipment that is required for the operation and use of the television equipment located in and outside of the hospitals.  Petitioners' use of the conduit and junction boxes is due, in part, to local building codes.  The items are used only and directly with the television sets located in petitioners' hospital facilities and the master television antennae attached to petitioners' hospitals.[10]

Televisions are attached to the walls of the hospitals near the room ceilings.  The television outlet receptacles in issue

_____

[10] The television antenna and antenna wire are not in dispute. The parties have agreed that the antenna, amplifier, and brackets constitute 5-year property.

are recessed in the walls approximately 18 inches below the acoustical tile ceilings. The electrical outlet receptacles relating to the televisions provide localized electrical power sources for the televisions at standardized voltages and standardized amperes. Most of the televisions are located in the patient rooms of petitioners' hospitals.

The antenna conduit protects the television antenna cables which extend between the master television antenna systems (or cable television hook-ups) and the antenna/cable television outlets located adjacent to the television outlet receptacles. The conduit protects the antenna wiring contained within it and is installed for the specific purpose of housing the television antenna wiring.

4. Conduit, Floor Boxes, Power Boxes, and Outlet Jacks Relating to Telephone Equipment (Property Unit 2330)

The telephone conduit, floor boxes, power boxes, and outlet jacks in Property Unit 2330 are required for the use and operation of the telephone equipment[11] located in petitioners' hospitals, due in part at least to local building codes. Those items are used only and directly with that telephone equipment and were installed specifically for use with the telephone equipment.

---

[11] The parties agree that the telephone equipment to which the items in Property Unit 2330 relate is properly depreciable over 5-year periods.

5.   <u>Electrical Wiring, Conduit, and Connections Relating to Internal Communications Systems (Property Unit 3090)</u>

The conduit, wiring, and electrical connections in Property Unit 3090 are required for the use and operation of the hospitals' internal communications systems (i.e., the nurse call systems, the intercommunications systems, the dictation systems, and the music and paging systems).[12]  Petitioners' use of the conduit, floor boxes, and outlet jacks is due in part to local building codes.  Those items are used only and directly with the equipment comprising those systems.  The items in issue are attached to the walls, floors, and ceilings of petitioners' hospitals and are located between the secondary electrical distribution systems and the particular items of equipment to which they relate.  The items are specifically for use with the hospitals' internal communication systems.

6.   <u>Carpeting (Property Unit 2140)</u>

The carpeting in Property Unit 2140 is the carpeting that was originally placed in petitioners' hospital facilities during construction.  The carpeting is custom fit to the area in which it is laid, and is installed over the sealed concrete floor using adhesives.  The adhesives prevent the carpeting from slipping or skidding while it covers the floors of the hospitals.

---

[12]   The parties agree that the machinery and equipment to which the items in Property Unit 3090 relate are properly depreciable over 5-year periods.

Petitioners typically replace carpeting after approximately 2-1/2 to 7 years of use due to heavy wear, soiling, and changes in the decor of petitioners' hospitals.[13]  Workers remove the carpeting by using a linoleum knife to lift up one corner of the carpeting and then by pulling the carpeting by hand from the concrete floors.  Removal of the carpeting is not a difficult or time-consuming process and does not damage the underlying concrete floors.  Petitioners typically discard the removed carpeting.  Petitioners do not allow the removed carpeting to be reused because of potential health risks.

### 7.  Vinyl Wall Coverings (Property Unit 2380)

The vinyl wall coverings originally placed in the various hospital facilities are also in issue.  The wall coverings consist of 3-foot or 4-foot wide strips of vinyl fabric.  The strips of vinyl fabric are secured to the walls with an adhesive.  The walls are treated with glue sizing prior to placing the vinyl wall coverings on the sheetrock walls of the hospital facilities.  The glue sizing protects the sheetrock walls from being damaged upon a subsequent removal of the wall coverings.

The vinyl wall covering is used as an alternative to painting the sheet rock walls.  Due to heavy wear and to changes

---

[13]  In one of the representative facilities, after approximately 8 years of use, more than 95 percent of the carpeting in issue had been removed and replaced. Petitioners intend to replace the remaining 5 percent of that carpeting, which is badly soiled and worn, when scheduling permits.

in the decor of petitioners' hospital facilities, petitioners remove and replace vinyl wall coverings after approximately 5 to 10 years of use.[14]

Removal of the wall coverings is accomplished by removing the base molding covering the bottom edge of the wall covering, grasping a corner of the wall covering, and pulling it off the walls. Removal of the vinyl wall coverings does not damage either the vinyl fabric or the sheetrock walls of the hospitals, and any residual adhesives that remain on the walls can be removed with very light sanding.

8. Vinyl Floor Coverings (Property Unit 2370)

The items in Property Unit 2370 consist of the vinyl tile and sheet vinyl floor coverings originally placed in petitioners' hospital facilities during construction. The floor coverings are of three general types: (1) 12-inch by 12-inch vinyl tiles, (2) 8-foot wide sheet vinyl, and (3) seamless vinyl floor covering.

Petitioners utilize all three types of vinyl floor coverings in a similar manner. The vinyl tiles are unpackaged, trimmed as necessary, and attached to the hospital floors using adhesive. The sheet vinyl is first cut to fit the area on which it is placed and also is attached to the concrete floors of the hospitals using adhesive. The seamless vinyl floor covering is

---

[14] In one of petitioners' representative facilities, after approximately 8 years of use, approximately 60 to 65 percent of the vinyl wall coverings in issue had been replaced.

installed similarly to the sheet vinyl but with its seams joined together using heat.

Petitioners replace vinyl floor coverings after about 3 to 5 years due to wear and changes in the decor of petitioners' facilities.[15]  The sheet vinyl and seamless vinyl floor covering are composed of a softer material than vinyl composition tile.

Workers remove sheet vinyl by lifting one corner of the vinyl and peeling it off the concrete floors.  Workers remove vinyl tile by using a mechanical scraper, which lifts the tiles off the concrete floors without damaging the floors.  The underlying adhesives are typically dry and powdery after the floor coverings are removed.  Removal of the vinyl tile floor coverings requires more effort than is necessary for removing carpeting; nonetheless, with the proper tools and skill, removal of the vinyl floor coverings goes relatively fast.  Petitioners discard the floor covering upon removal.

9. Kitchen Water Piping (Property Unit 3080) and Kitchen
   Equipment Steam Lines (Property Unit 3070)

Petitioners maintain kitchens which are used to prepare meals for most inpatients on a daily basis as a part of providing health care services to those patients.  Petitioners also operate

---

[15]  In one of petitioners' representative facilities, after approximately 8 years of use, two-thirds of the original vinyl floor coverings had been replaced.

hospital cafeterias where food is sold to hospital employees, visitors, and the public for cash.

The kitchen water piping in Property Unit 3080 consists of the following distinct categories of items: (1) items relating to the operation of the kitchen grease trap systems,[16] the trench drains, the grease waste piping, the grease waste excavation, the grease waste fill, and the grease trap itself, and (2) plumbing connections (including the hose reel connections) for particular items of kitchen equipment. The piping is contained in the walls of petitioners' hospital facilities and fastened to the building structures.

The kitchen grease trap systems consist of underground tanks and the related plumbing connections. The grease traps have inlet chambers connected to kitchen waste pipes and outlet chambers connected to the domestic sanitary sewers, and they serve as buffers between the kitchen waste pipes and the sanitary sewer systems. Their function is to remove grease and solid matter from waste water leaving the kitchen areas while allowing the remaining waste water to pass into the sanitary sewers.

The kitchen plumbing connections in issue supply water to specific items of kitchen equipment, such as the dishwashers, coffee urns, steam kettles, braising pans, and ice makers, and

---

[16] Respondent agrees that the kitchen grease trap systems in issue are similar to those in issue in Morrison, Inc. v. Commissioner, T.C. Memo. 1986-129.

remove the liquid wastes generated by that equipment. The plumbing connections branch off of a hospital's main water lines to the walls near the specific pieces of equipment the plumbing connections are intended to serve. The plumbing connections are necessary for the operation of the items of equipment to which they relate and are used only with the items of equipment to which they relate. If necessary, the connections could be adapted for other uses. The hose reel connections are located behind the walls and are used to connect the hose reel to hot and cold potable water.

The kitchen equipment steam lines in Property Unit 3070 are in all material respects identical to the kitchen plumbing connections (Property Unit 3080) described above.

10. Special Plumbing Connections Relating to X-Ray Equipment (Property Unit 2244)

The plumbing connections relating to the x-ray equipment are required for the operation and use of the x-ray film processing equipment located in petitioners' hospitals. Those connections are used only with that equipment. The plumbing connections are located in the walls and floors between the hospitals' main plumbing lines and the x-ray film processing equipment they are intended to serve. Removal of those plumbing connections would not affect the hospitals' main water piping and sanitary drainage.

11.  Kitchen Hoods and Exhaust Systems (Property Unit 3085)

The kitchen hoods and exhaust systems consist of the cooking area exhaust hoods and fans, the kitchen supply air intake fans, the dishwasher exhaust fans, and related duct work.  Dishwasher condensate return units are also included.

The exhaust hoods and fans are placed directly over the kitchen cooking equipment, where they collect and guide cooking vapors, grease, smoke, humidity, and other fumes moving from the kitchen cooking equipment into the exhaust duct work to be expelled outside of the hospital buildings.  The kitchen hoods are installed on frames bolted to the overhead structure, and the frames are attached to a reinforced concrete floor structure. The sheet metal duct work is installed in a continuous run from the kitchen hood through the floors overhead to a curbed roof opening in a covered discharge unit.  The kitchen exhaust hoods contain their own chemical fire protection and lighting system.

The kitchen exhaust fans are attached with steel screws. They do not serve to ventilate the hospital buildings generally, and they are not part of the hospital buildings' heating, ventilation, or air conditioning systems.

The kitchen supply air intake fans (or the "air make-up units")[17] replace the air removed from the kitchens by the

---

[17]    Respondent agrees that, with the exception of the condensate return unit, although smaller, the kitchen supply air intake fans
(continued...)

kitchen exhaust fans to insure proper negative balance in the air pressure. The kitchen supply air intake fans ensure that a hospital kitchen maintains negative pressure with relation to the remainder of the hospital building by replacing air that is exhausted by the kitchen exhaust fans. The kitchen supply air intake fans are attached to the roofs of petitioners' hospitals using bolts and are connected to metal duct work used only with that equipment.

The dishwasher exhaust fans remove moisture and humidity generated by the dishwasher and are vented to both ends of the dishwasher. The fans serve to ventilate only the dishwashing area of the kitchens and ensure that the dishwashers operate efficiently. The fans are attached to the roofs of the facilities using bolts and are connected to duct work specifically designed for and used only with those fans.

The dishwasher condensate return units consist of water piping which provides an emergency source of hot water for the dishwashers. The piping is attached to the building and runs from a dishwasher to a boiler and back to the dishwasher. It is separate and apart from the building plumbing and is used exclusively to connect the dishwashers with the boilers. Removal

---

[17] (...continued)
in petitioners' hospitals are similar to those in issue in Morrison, Inc. v. Commissioner, supra.

of the condensate return unit piping would not affect the hospital's main water piping and sanitary drainage.

The kitchen duct work is placed in the walls and ceilings during construction. The duct work is fastened to the building structure with steel hangers. It is not movable without removal of building walls and ceilings. Portions may be removable but that partial removal would render the remaining sections unusable. The sheet metal duct work, exhaust hoods, exhaust and supply fans, and condensate return units are fixed to the building with screws and bolts. The frames are bolted and welded. Much of the installation is through walls, ceilings, and roofs, and specific openings are made in the structure for those items.

12. Patient Corridor Handrails (Property Unit 3190)

Patient corridor handrails[18] are strips of hard plastic, about 1-3/4-inches at the top and 6-inches wide, which are attached to the walls in certain areas of petitioners' hospitals using bolts and clip brackets. The patient corridor handrails are placed approximately 32-inches above the hospital floors and extend 3-1/2-inches from the wall surface. They are installed in

---

[18] The patient corridor handrails in issue do not include handrails located in hospital stairwells or those required by elevation changes, nor do they include bumper guards, which are located in all hallways and corridors and used to protect the walls of petitioners' buildings.

patient corridors of the hospitals to assist in the rehabilitation of petitioners' patients.

Patient corridor handrails can be removed from the walls of the hospitals. After removal, the handrails can be replaced or relocated within the hospital.

Local fire or building codes do not require patient corridor handrails.

13. Overbed Lights and Related Electrical Connections (Property Unit 4050)

The overbed lights are 4-tube, 4-foot fluorescent lighting fixtures installed in a standard opening in the acoustical ceiling grid and are positioned directly over the patient beds in each patient room. They are similar in appearance to general lighting fixtures. The lights are controlled by switches located on the headwall units above the patient bed headboards. The placement of the switches allows the overbed lights to be activated by someone standing at the patient's bedside and makes it difficult for a patient to activate the overbed light while lying in bed.

The overbed lights are designed to be used and are used to provide a light source during the examination of patients by medical staff or physicians. The overbed lights are referred to as "exam lights" on the hospital blueprints.

The patient rooms are approximately 100 square feet in size. Other lighting devices in the patient rooms also provide room

illumination.[19]  For example, each patient room contains a 2-tube fluorescent light fixture which is attached to the wall just above each patient bed headboard and which is activated by a pull cord placed within the patient's reach.  Additionally, each patient room contains a fluorescent light fixture placed over the vanity cabinet located in the patient room area and a night light that provides exit lighting during the night.  Furthermore, each patient room contains one large double-pane window which illuminates the patient rooms during the daylight hours.  Use of the overbed lights may be uncomfortable for some patients because of the brightness of the lights and of the placement of the lights directly over a patient's bed.

The electrical conduit, wiring, and junction boxes relating to the overbed lights are used only with those lights, but, if necessary, they could be adapted for other uses.  The electrical connections relating to the overbed lights are necessary for the operation of the overbed lights.

14.  Accordion Doors/Partitions (Property Unit 3240)

The accordion doors/partitions (partitions) in the subject category consist of two different types of accordion-style room dividers.  Both types are approximately 8- to 10-foot high and, when expanded, are used to subdivide the hospital cafeterias and conference rooms into smaller rooms.  They are attached to the

---

[19]  Those lighting devices are not in issue.

hospital walls and are expanded and contracted by manually pulling them along tracks attached to the ceilings. The partitions are suspended from those tracks. The tracks are mounted on 2-inch by 4-inch or 2-inch by 6-inch blocking, which is attached to the ceilings of the hospital buildings and supported from above by angled steel arms. The partitions do not bear any structural loads. The partition located in the cafeteria contains a door which allows passage through the subdivided rooms when the accordion is fully extended.

The partitions located in the hospital conference rooms represent 44 percent of the total cost bases of the partitions in issue. The partitions located in the hospital cafeterias represent the remaining 56 percent of the total cost bases of the partitions in issue.

The partition originally placed in a West Houston Medical Center conference room has been removed and is currently in storage. Removal of the partition has not affected the essential structure of the West Houston Medical Center. The supporting steel and wood for that partition still is attached to the structural frame at the site of the original installation, covered by the acoustical ceiling.

15. <u>Bathroom Accessories and Partitions (Property Unit 2360) and Plastic Mirrors (Property Unit 2385)</u>

Petitioners' hospital facilities contain a large number of bathrooms in addition to employee bathrooms and public

bathrooms.[20] The bathroom accessories in issue consist of the following items located in patient bathrooms of petitioners' hospitals: Paper towel dispensers, soap dispensers, mirrors, towel racks, grab bars, toilet paper holders, bathrobe hooks, shower curtain rods, and toiletry shelves. Petitioners' staff and employees do not use the patient bathrooms, except as necessary to provide health care services to the patients.

Toilet accessories such as grab bars require support by double studding behind the walls. The bathroom accessories are attached to either the walls or the doors of the patient bathrooms using screws. They can be removed from the walls of the bathrooms by removing the screws and backplates attaching them to the walls. Removal of those items does not damage either the items or the walls. Removal of the items is not a time-consuming or difficult process, and one of the items typically could be removed from a wall within 1 minute. If removed, the items could be reused elsewhere if the necessary blocking is in place. The plastic mirrors included in Property Unit 2385 are in all material respects identical to the mirrors located in the patient rooms which are included in Property Unit 2360.

---

[20] Petitioners concede that the bathroom accessories in Property Unit 2360 located in non-patient bathrooms (i.e., the employee and public bathrooms) relate to the operation or maintenance of a building and thus constitute structural components of the buildings. Seventy-five percent of the total cost of the bathroom accessories included in Property Unit 2360 is attributable to the bathroom accessories located in patient bathrooms.

16.  <u>Acoustical Tile Ceilings (Property Unit 2260)</u>

The acoustical tile ceilings (acoustical ceilings) consist of metal grid systems, typically with a 2-foot by 2-foot or 2-foot by 4-foot opening, and squares of acoustical tile that are laid into the openings of the grids.  The grids are installed in select areas of petitioners' hospital facilities and are hung by wires parallel to the structural frames of the hospital buildings, approximately 8- to 12-feet above the concrete floors.  The wires are attached to the structural frames of the hospital buildings using eye bolts.  The grids are attached to the hospital walls using nails or screws.  Light fixtures, speakers, air conditioning vents, and sprinkler heads are placed in openings of the grids or through openings cut in the tiles.

The acoustical ceilings are movable and have been moved, reconfigured, and reused by petitioners in at least one of petitioners' representative facilities.  Acoustical ceilings hide unsightly plumbing and piping, conduit, wiring, and air conditioning ducts which are installed between the structural frame above and the ceiling.  The acoustical ceilings also enhance the cleanliness of petitioners' hospitals by preventing dirt and dust from falling from the pipes and duct work located between the acoustical ceilings and the structural ceilings of the hospitals into the areas below.  Acoustical tiles additionally provide a sound deadening material, which reduces noise.  They also serve a decorative function.

The acoustical ceilings utilized by petitioners are typical of the ceilings used in many commercial buildings. Painted gypsum board is used for ceilings in the critical areas of the hospitals, such as the operating, trauma, and medical areas. Hospital accreditation commissions require hospitals to have ceilings in order to operate as hospitals.

17. Steam Boilers and Related Accessories (Property Unit 3193)

The steam boiler systems in Property Unit 3193 are shop-assembled, high-pressure, steam-operated boilers and related accessories. The steam boilers produce steam that is used to provide heat for petitioners' hospitals and that is distributed to specific items of hospital equipment, such as the air make-up units, hot water heaters, kitchen equipment, operating room humidifiers, and central sterilization equipment.

The boilers and related accessories are bolted to structural steel frames, which are encased in a concrete slab, raised floor. Bolts, embedded into the concrete, are used both to level the boilers and to secure the installation. The boiler stacks are attached to the structural roof and extend through the roof to an elevation which facilitates the dispersion of fumes.

The boilers and related accessories are placed in the mechanical room and are interconnected with the piping used to transmit the high temperature water and steam. The entire system is integrated into the building mechanical system.

Boilers are not easily removed.  The installation and/or removal of a boiler would require a skilled mechanical subcontractor.

OPINION

During taxable years ended 1985 through 1988, petitioners constructed a number of hospital facilities, which they used in their trade or business.  For purposes of our decision as to petitioners' entitlement to depreciation deductions relating to those facilities for those taxable years, the parties do not agree on the appropriate recovery classes or recovery periods for the disputed property items[21] contained in the facilities.  Resolution of that issue entails our decision as to whether the disputed property items constitute section 1245 class property or section 1250 class property.  The parties have stipulated that if a disputed property item constitutes section 1245 class property, it is depreciable over a 5-year recovery period, but if the disputed property item constitutes section 1250 class property, it is depreciable over an 18-, 19-, or 31.5-year recovery period (depending on when the item was placed in service).[22]

---

[21]    The parties have agreed on the classification of a number of property items relating to the constructed facilities, but they are unable to agree as to the disputed property items described supra.

[22]    The recovery period for real property placed in service after March 15, 1984, but before May 9, 1985, generally is 18 years.  Deficit Reduction Act of 1984 (DRA-1984), Pub. L. 98-369, sec. 111, 98 Stat. 634; Simplification of Imputed Interest Rules
(continued...)

Accordingly, we must decide whether the tests developed under prior law for purposes of the investment tax credit must be used in deciding the appropriate recovery classes (for tax years ended 1985 and 1986) or appropriate recovery periods (for tax years ended 1987 and 1988) for the disputed property items that petitioners placed in service during those years and, if so, whether the respective properties constitute section 1245 class property or section 1250 class property pursuant to those tests.

Petitioners contend that the disputed property items constitute section 1245 class property and that those items are depreciable over 5-year periods. Respondent contends that the disputed property items are section 1250 class property because they are structural components of the buildings to which they relate, and, thus, they are depreciable over the same recovery period as the buildings.

---

[22] (...continued)
(SIIR), Pub. L. 99-121, secs. 103, 105(a), 99 Stat. 509-511 (1985). The recovery for real property placed in service after May 8, 1985, but before Dec. 31, 1986, generally is 19 years. SIIR, secs. 103, 105(a); Tax Reform Act of 1986 (TRA-1986), Pub. L. 99-514, secs. 201, 203, 100 Stat. 2122-2123, 2143. The recovery period for nonresidential real property placed in service after Dec. 31, 1986, but before May 12, 1993, generally is 31.5 years. TRA-86, secs. 201, 203; Omnibus Budget Reconciliation Act of 1993 (OBRA-1993), Pub. L. 103-66, sec. 13151, 107 Stat. 448. For convenience, we refer to property placed in service between Jan. 1, 1985, and Dec. 31, 1986, generally as 19-year property.

In General

Section 167 prescribes general rules governing the depreciation deduction, which provides a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business or held for the production of income.  Section 168, added to the Internal Revenue Code (Code) by the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, 95 Stat. 172, describes a specific depreciation system, entitled "Accelerated Cost Recovery System" (ACRS), applicable generally for tangible, depreciable property placed in service after December 31, 1980. ERTA, secs. 201(a), 209(a), 95 Stat. 226.  During 1986, Congress replaced ACRS with a modified accelerated cost recovery system (MACRS), effective generally for tangible, depreciable property placed in service after December 31, 1986.  Tax Reform Act of 1986 (TRA-86), Pub. L. 99-514, secs. 201, 203, 100 Stat. 2122-2123, 2143.  Accordingly, the disputed property items placed in service during 1985 and 1986 are subject to the ACRS rules, and the disputed property items placed in service after 1986 are subject to the MACRS rules.

ACRS

Congress enacted ACRS to stimulate the economy by allowing greater depreciation deductions over shorter depreciation periods and to simplify the depreciation rules.  Sprint Corp. v. Commissioner, 108 T.C. 383 (1997); Simon v. Commissioner, 103 T.C. 247, 255 (1994), affd. 68 F.3d 41 (2d Cir. 1995); Liddle v.

Commissioner, 103 T.C. 285, 289, 290 (1994), affd. 65 F.3d 329 (3d Cir. 1995); see also Collins Music Co. v. United States, 21 F.3d 1330, 1332 (4th Cir. 1994); S. Rept. 97-144, at 47 (1981), 1981-2 C.B. 412, 425. ACRS permits a depreciation deduction for recovery property over a predetermined recovery period by applying a statutory percentage to its cost. Sec. 168(b); Schrum v. Commissioner, T.C. Memo. 1993-124, affd. in part and vacated and remanded in part on another issue 33 F.3d 426 (4th Cir. 1994).

Recovery property is defined generally as "tangible property of a character subject to the allowance for depreciation--(A) used in a trade or business, or (B) held for the production of income." Sec. 168(c)(1). Recovery property is assigned to one of the following classes of property: 3-year property, 5-year property, 10-year property, 19-year real property, 15-year public utility property, or low-income housing. Sec. 168(c)(2). A special rule applies for theme parks. Sec. 168(c)(2)(G).

Five-year property includes section 1245 class property which is not 3-year property, 10-year property, or 15-year public utility property. Sec. 168(c)(2)(B). Five-year property, thus, includes section 1245 class property with no assigned class life. Sec. 168(c)(2)(B); Collins Music Co. v. United States, supra at 1333. Nineteen-year real property "means section 1250 class property which--(i) does not have a present class life of 12.5

years or less, and (ii) is not low-income housing."  Sec. 168(c)(2)(D).

The present class life of a property item is "the class life (if any) which would be applicable with respect to any property as of January 1, 1981, under subsection (m) of section 167 (determined without regard to paragraph (4) thereof and as if the taxpayer had made an election under such subsection)."[23]  Sec. 168(g)(2).  Additionally, respondent may prescribe a present class life that reasonably reflects the anticipated useful life of the property for any property that did not have a present class life as of January 1, 1981.  Sec. 168(g)(2).  Class life refers to the class life of property assigned by respondent that reasonably reflects the anticipated useful life of that class of property to a particular industry or other group.  Sec. 167(m);

---

[23]  Sec. 167(m) was repealed as an obsolete provision by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11812, 104 Stat. 1389-534.  Prior to its repeal, sec. 167(m) provided as follows:

SEC. 167(m) Class Lives.--

(1)  In General.--In the case of a taxpayer who has made an election under this subsection for the taxable year, the term "reasonable allowance" as used in subsection (a) means (with respect to property which is placed in service during the taxable year and which is included in any class for which a class life has been prescribed) only an allowance based on the class life prescribed by the Secretary which reasonably reflects the anticipated useful life of that class of property to the industry or other group.  The allowance so prescribed may (under regulations prescribed by the Secretary) permit a variance from any class life by not more than 20 percent (rounded to the nearest half year) of such life.

see sec. 1.167(a)-11, Income Tax Regs.  Accordingly, ACRS

incorporates by reference the Asset Depreciation Range (ADR)[24]

classifications.  Sec. 168(g)(2); <u>Walgreen Co. v. Commissioner</u>,

68 F.3d 1006, 1008 (7th Cir. 1995), revg. and remanding on

another issue 103 T.C. 582 (1994).  ACRS reduces the number of

property classes from around 125 under the ADR system to six

(five as originally enacted).  Sec. 168(c)(2); <u>Sprint Corp. v.</u>

<u>Commissioner</u>, <u>supra</u>.

In several revenue procedures, respondent had prescribed

asset guideline classes, asset guideline periods (class lives)

and ranges, and annual asset guideline repair allowance

percentages for assets used in business, manufacturing, and other

activities.  E.g., Rev. Proc. 87-56, 1987-2 C.B. 674; Rev. Proc.

---

[24]    Prior to ERTA, the principal method used to assign useful
lives for personal property was the ADR and class life system,
which was effective generally for assets placed in service after
1970 and before 1981.  <u>Walgreen Co. v. Commissioner</u>, 103 T.C.
582, 586-588 (1994), revd. and remanded on another issue 68 F.3d
1006 (7th Cir. 1995); <u>Simon v. Commissioner</u>, 103 T.C. 247, 254-
255 (1994), affd. 68 F.3d 41 (2d Cir. 1995); <u>Clinger v.
Commissioner</u>, T.C. Memo. 1990-459; see also sec. 1.167(a)-(11),
Income Tax Regs.  Pursuant to that system, assets were grouped
into approximately 125 different asset guideline classes and a
guideline life was assigned to each class.  A range of years,
i.e., the ADR, was then provided for each class of personal
property.  The taxpayer could use a useful life of up to 20
percent longer or 20 percent shorter than the guideline life
prescribed by respondent for particular classes of depreciable
property.  For each asset account in the class, the taxpayer
selected either a class life or an ADR that was used as the
useful life for computing depreciation.  <u>Sprint Corp. v.
Commissioner</u>, 108 T.C. 384 (1997); <u>Walgreen Co. v. Commissioner</u>,
<u>supra</u>; <u>Simon v. Commissioner</u>, <u>supra</u>; <u>Clinger v. Commissioner</u>,
<u>supra</u>.

83-35, 1983-1 C.B. 745.  The revenue procedures provide ADR classes for specified depreciable assets generally used in all business activities, except as noted, as well as for depreciable assets used in certain businesses.  Rev. Proc. 83-35, supra, is applicable for assets placed in service during years ended 1985 and 1986.  The present class life is the asset guideline period (i.e., the midpoint class life) established for the particular class.  Rev. Proc. 83-35, sec. 101, 1983-1 C.B. at 745.

The component method of depreciation is not permitted under ACRS.  Sec. 168(f)(1).[25]  The component method of depreciation is

---

[25]    Sec. 168(f) provides in pertinent part as follows:

SEC. 168(f)  Special rules for application of this section. --For purposes of this section--

(1)  Components of section 1250 class property.--

(A) In general.--Except as otherwise provided in this paragraph--

(i) the deduction allowable under subsection (a) with respect to any component (which is section 1250 class property) of a building shall be computed in the same manner as the deduction allowable with respect to such building, and

(ii) the recovery period for such component shall begin on the later of--

(I) the date such component is placed in service, or

(II) the date on which the building is placed in service.

(B) Transitional rules.

(continued...)

a method of depreciation that "fragments an item of property, often a building, into its elements (e.g., shell, plumbing, and wiring) and applies individual useful lives and salvage values to each such component." Westin, Lexicon of Tax Terminology 127 (1984); see also Shainberg v. Commissioner, 33 T.C. 241 (1959); sec. 1.167-7, Income Tax Regs.

Accordingly, the parties agree that the disputed property items placed in service during 1985 and 1986 constitute 5-year property, as petitioners contend, only if the items constitute section 1245 class property, and do not constitute structural components of section 1250 class property, as respondent contends they do.

MACRS

MACRS provides that the "depreciation deduction provided by section 167(a) for any tangible property shall be determined by using--(1) the applicable depreciation method, (2) the applicable recovery period, and (3) the applicable convention." Sec. 168(a). For purposes of the general depreciation system, which is involved in the instant case, MACRS generally classifies

---

[25] (...continued)

    \*     \*     \*     \*     \*     \*     \*

(C) Exception for substantial improvements.--

(i) In general. For purposes of this paragraph, a substantial improvement shall be treated as a separate building.

eligible personal property and certain real property as 3-year property, 5-year property, 7-year property, 10-year property, 15-year property, or 20-year property, and assigns that property to a corresponding recovery period on the basis of the property's class life. Sec. 168(c), (e)(1), (e)(3). MACRS generally classifies section 1250 real property as residential rental property (which is not involved in the instant case) or nonresidential real property,[26] which are assigned to a 27.5-year recovery period or a 31.5-year recovery period,[27] respectively. Sec. 168(c), (e)(2).

Section 168(i)(1) provides that the term "class life" means "the class life (if any) which would be applicable with respect to any property as of January 1, 1986, under subsection (m) of section 167". That class life generally is the midpoint class life for the asset guideline class to which the property was assigned as of January 1, 1986, pursuant to Rev. Proc. 83-35,

---

[26] Sec. 168(e)(2)(B) defines nonresidential real property as follows:

(B) Nonresidential real property.--The term "nonresidential real property" means section 1250 property which is not--

(i) residential rental property, or

(ii) property with a class life of less than 27.5 years.

[27] OBRA-1993, sec. 13151, 107 Stat. 448, extended to 39 years the recovery period for nonresidential real property placed in service after May 12, 1993.

1983-1 C.B. 745.[28]  Rev. Proc. 87-56, sec. 2.20, 1987-2 C.B. at

674.  Section 168(i)(1)(B) provides that, except in the case of

residential rental property or nonresidential real property,

respondent may designate a class life for any property which does

not have a prescribed class life as of January 1, 1986, or,

within restrictions, may modify the class life of property.[29]

See sec. 168(i)(1)(D).  Additionally, section 168(e) assigns

recovery periods to certain tangible, depreciable property

regardless of its class life.  Sec. 168(e)(3).  Rev. Proc. 87-56,

section 5, 1987-2 C.B. 674, as clarified and modified by Rev.

Proc. 88-22, 1988-1 C.B. 785, prescribes class lives and recovery

periods applicable for years ended 1987 and 1988.

   MACRS repealed ACRS section 168(f)(1), which related

specifically to components of section 1250 class property.

Section 168(i)(6),[30] however, provides that improvements made to

_____

[28]   With the exception of telephone central office equipment for
which a class life was delineated in Rev. Proc. 82-67, 1982-2
C.B. 853, the class lives for property as of Jan. 1, 1986, for
property that had assigned class lives, remained the same as
their class lives as of Jan. 1, 1981.  See Collins Music Co. v.
United States, 21 F.3d 1330, 1333-1334 (4th Cir. 1994); Rev.
Proc. 83-35, sec. 1.01, 1983-1 C.B. 745, 745.

[29]   Congress repealed respondent's authority to prescribe or
modify class lives in sec. 6253 of the Technical and
Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat.
3753.

[30]   Sec. 168(i)(6) provides as follows:

        (6) Treatments of additions or improvements to
     property.--In the case of any addition to (or improvement
                                              (continued...)

real property are depreciated using the same recovery period applicable to the underlying property as if the underlying property were placed in service at the time the improvements were made.  Accordingly, MACRS continues the prohibition against the use of the component method of depreciation.  S. Rept. 99-313, at 105 (1986), 1986-3 C.B. (Vol. 3) 105.

Congress did not assign a specific class life to the disputed property items placed in service during 1986 and 1987. See sec. 168(e)(3).  Accordingly, the parties agree that the disputed property items constitute 5-year property, as petitioners contend, only if the items have a class life of more than 4 years but less than 10 years pursuant to Rev. Proc. 87-56, as clarified and modified by Rev. Proc. 88-22, sec. 168(c), (e)(1), and the disputed property items do not constitute

---

[30]  (...continued)
   of) any property--

       (A) any deduction under subsection (a) for such addition or improvement shall be computed in the same manner as the deduction of such property would be computed if such property had been placed in service at the same time as such addition or improvement, and

       (B) the applicable recovery period for such addition or improvement shall begin on the later of--

           (i) the date on which such addition (or improvement) is placed in service, or

           (ii) the date on which the property with respect to which such addition (or improvement) was made is placed in service.

structural components of nonresidential real property, as respondent contends they do.

The Meaning of Section 1245 Class Property Under ACRS and MACRS.

Respondent does not dispute for purposes of the instant case that petitioners' business is described in Asset Guideline Class 57.0 (Class 57.0). Rev. Proc. 83-35, 1983-1 C.B. at 762, and Rev. Proc. 87-56, 1987-2 C.B. at 686, describe Class 57.0 as follows: "Distributive Trades and Services: Includes assets used in wholesale and retail trade, and personal and professional services. Includes section 1245 assets used in marketing petroleum and petroleum products". Both revenue procedures prescribe a 9-year class life for assets in Class 57.0. Rev. Proc. 83-85, supra; Rev. Proc. 87-56, supra. ACRS and MACRS both provide that property with a 9-year class life is depreciable over a 5-year period. Sec. 168(c)(2)(B) (1985 and 1986); sec. 168(c), (e)(1) (1986 and 1987). Consequently, unless the disputed property items constitute section 1250 class property, they are depreciable over 5-year periods because petitioners' businesses fall within the category "personal and professional services".

Petitioners contend that the disputed property items constitute section 1245 class property pursuant to the Code, relevant legislative history, relevant income tax regulations, respondent's long-standing rulings, and prior decisions of this Court and, therefore, are properly depreciable over 5-year

periods.  Petitioners maintain that the question of whether property constitutes section 1245 or section 1250 property frequently was presented to respondent and to the courts in the context of whether property constituted tangible personal property for purposes of qualifying for ITC and that a similar analysis is appropriate for purposes of ACRS and MACRS.

Respondent has raised a number of arguments in support of the position that the disputed property items constitute section 1250 class property.  Respondent's principal argument is that using a different recovery period for the disputed property items than for the buildings to which they relate in effect results in component depreciation, which method is no longer permitted under ACRS and MACRS.  Respondent argues that the cases on which petitioners primarily rely are not applicable to the instant case because those cases involve tax years prior to 1981, when component depreciation was permissible, and they deal with ITC. Respondent asserts that the judicially developed ITC tests have limited application in determining what constitutes a structural component for purposes of applying ACRS and MACRS in light of the elimination of the component method of accounting.  Respondent maintains that the disputed property items must be depreciated over the same recovery period as the structure to which they relate.  Respondent's position raises an issue of first impression.

To resolve that issue, we look to the language of the statute. Because the relevant ACRS and MACRS provisions differ, we discuss separately our conclusion that, in prohibiting component depreciation, Congress did not intend to eliminate from 5-year property those disputed property items which would satisfy the definition of tangible personal property pursuant to section 1245(a)(3)(A) prior to the enactment of ACRS or MACRS.

ACRS

As we discussed supra, to be classified as 5-year property the disputed property items must constitute section 1245 class property. Sec. 168(c)(2)(B).[31] Section 1245 class property consists of "tangible property described in section 1245(a)(3) other than subparagraphs (C) and (D)."[32] Sec. 168(g)(3).[33] On

---

[31]   For taxable years ended 1984 and 1985, sec. 168(c)(2)(B) provides as follows:

   (B)  5-year property.--The term "5-year property" means recovery property which is section 1245 class property and which is not 3-year property, 10-year property, or 15-year public utility property.

[32]   Sec. 1245(a)(3) provides as follows:

   (3) Section 1245 Property.--For purposes of this section, the term "section 1245 property" means any property which is or has been property of a character subject to the allowance for depreciation provided in section 167 (or subject to the allowance of amortization provided in section 185) and is either--

      (A) personal property,

      (B) other property (not including a building or its structural components) but only if such other
(continued...)

the other hand, to constitute 19-year real property, the property

must be section 1250 class property.  Section 1250 class property

_____

[32]  (...continued)
property is tangible and has an adjusted basis in which
there are reflected adjustments described in paragraph (2)
for a period in which such property (or other property)--

(i) was used as an integral part of
manufacturing, production, or extraction or of
furnishing transportation, communications,
electrical energy, gas, water, or sewage disposal
services, or

(ii) constituted a research facility used in
connection with any of the activities referred to
in clause (i), or

(iii) constituted a facility used in
connection with any of the activities referred to
in clause (i) for the bulk storage of fungible
commodities (including commodities in a liquid or
gaseous state),

(C) an elevator or an escalator,

(D) so much of any real property (other than any
property described in subparagraph (B)) which has an
adjusted basis in which there are reflected adjustments
for amortization under section 169, 179, 185, 188, 190,
193, or 194,

(E) a single purpose agricultural or horticultural
structure (as defined in section 48(p)), or

(F) a storage facility (not including a building
or its structural components) used in connection with
the distribution of petroleum or any primary product of
petroleum.

[33]  For taxable years ended 1984 and 1985, sec. 168(g)(3)
provides as follows:

The term "section 1245 class property" means tangible
property described in section 1245(a)(3) other than
subparagraphs (C) and (D).

embodies "property described in section 1250(c)[34] and * * * in section 1245(a)(3)(C)."  Sec. 168(g)(4).[35]

Petitioners are not engaged in an activity described in section 1245(a)(3)(B).  Additionally, the disputed property items are not described in section 1245(a)(3)(E) or (F).  Accordingly, the disputed property items constitute section 1245 class property only if they are personal property as defined in section 1245(a)(3)(A).  See also sec. 1.1245-3(a), Income Tax Regs.

Section 1.1245-3(b)(1), Income Tax Regs., defines personal property as "(1) Tangible personal property (as defined in paragraph (c) of § 1.48-1, relating to the definition of 'section 38 property' for purposes of the investment credit)".  Accordingly, ACRS incorporates within the meaning of section 1245 class property tangible personal property defined in section 1.48-1(c), Income Tax Regs.[36]

---

[34]   Sec. 1250(c) provides as follows:

(c) Section 1250 Property.  For purposes of this section, the term "section 1250 property" means any real property (other than section 1245 property, as defined in section 1245(a)(3)) which is or has been property of a character subject to the allowance for depreciation provided in section 167.

[35]   For taxable years ended 1984 and 1985, sec. 168(g)(4) provides as follows:

(4)  Section 1250 class property.  The term "section 1250 class property" means property described in section 1250(c) and property described in section 1245(a)(3)(C).

[36]   Sec. 1.48-1(c), Income Tax Regs., provides as follows:
(continued...)

Nineteen-year real property consists of section 1250 class property with a present class life of more than 12.5 years, except for low-income housing as defined in section 168(c)(2)(F). Sec. 168(c)(2)(D).  Section 1250 class property is property described in section 1250(c) and in section 1245(a)(3)(C).  Sec.

---

36  (...continued)
    (c)  Definition of tangible personal property.  If property is tangible personal property it may qualify as section 38 property irrespective of whether it is used as an integral part of an activity (or constitutes a research or storage facility used in connection with such activity) specified in paragraph (a) of this section.  Local law shall not be controlling for purposes of determining whether property is or is not "tangible" or "personal".  Thus, the fact that under local law property is held to be personal property or tangible property shall not be controlling.  Conversely, property may be personal property for purposes of the investment credit even though under local law the property is considered to be a fixture and therefore real property. For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures).  Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property.  Tangible personal property includes all property (other than structural components) which is contained in or attached to a building.  Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building constitutes tangible personal property for purposes of the credit allowed by section 38.  Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building.  Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.

168(g)(4).  Section 1250(c) defines section 1250 property to mean "any real property (other than section 1245 property, as defined in section 1245(a)(3))".  Section 1245(a)(3)(C) includes elevators and escalators within the definition of section 1245 property.

Section 1.1250-1(e)(3)(i), Income Tax Regs., defines real property to include the structural components of a building within the meaning of section 1.1245-3(c), Income Tax Regs., which provides in pertinent part that "the terms 'building' and 'structural components' shall have the meanings assigned to those terms in paragraph (e) of § 1.48-1."[37]

---

[37]  Sec. 1.48-1(e)(2) provides in pertinent part as follows:

(2)  The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as paneling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building.  However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs.  Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. * * *

The foregoing statutory and regulatory provisions support a conclusion that Congress intended that the same tests be used to ascertain whether property constitutes section 1245 class property or section 1250 class property for purposes of ACRS as are applied for purposes of determining whether property qualifies for ITC. See also Schrum v. Commissioner, 33 F.3d 426, 437 (4th Cir. 1994), affg. in part and vacating and remanding in part on another issue T.C. Memo. 1993-124, where the Court of Appeals observed: "That the classes of section 38 property and section 1245 property are, for present purposes, coextensive, is confirmed by Treasury Regulation § 1.1245-3(b)(1), which, in defining section 1245 property, makes several references to Treasury Regulation § 1.48-1(c)." (Fn ref. omitted.)

Respondent, however, contends that section 168(f)(1),[38] which prohibits component depreciation, effectively operates to change the definition of tangible personal property for purposes of ACRS to eliminate from section 1245 class property, and to include in section 1250 class property, any item which is attached to a building and that has utility beyond its relation to a particular piece of property, even if under long-standing precedent the property constitutes personal property for purposes of section 38 and section 1245. We, however, do not agree.

---

[38]    See supra note 25.

Section 168(f)(1) only could apply to property that constitutes section 1250 class property as that term was understood at the time Congress enacted ACRS. Neither the statute nor its legislative history reveals an intent by Congress to redefine section 1250(c) to include property, which at that time, was considered under long-standing precedent to constitute section 1245 property. Had Congress intended that outcome, we believe Congress would have clearly set forth that intent in the statute or in its legislative history. To the contrary, the statutory language supports petitioners' position. Section 168(f)(1)(A)(i) provides that "the deduction allowable under subsection (a) with respect to any component (<u>which is section 1250 class property</u>) of a building shall be computed in the same manner as the deduction allowable with respect to such building". (Emphasis added.) Thus, the statutory provision plainly and only speaks to section 1250 class property, which section 168(g)(4) defines as property described in section 1250(c). As discussed <u>supra</u>, the regulations under section 1250(c) incorporate by reference section 1.1245-3(c), Income Tax Regs., which incorporates by reference section 1.48-1(e), Income Tax Regs. Accordingly, we conclude that the statutory language manifests a congressional intent to retain the prior law distinction between components that constitute section 1250 class property and property items that constitute section 1245 class property.

The legislative history does not reveal a contrary intention. The legislative history relating to section 168(f)(1)(A) does not focus on the definition of section 1250 class property or on the definition of structural components contained in section 1.48-1(e), Income Tax Regs. See H. Rept. 97-201, at 67-68, 84 (1981); S. Rept. 97-144 (1981), 1981-2 C.B. 412, 428. Moreover, the General Explanation of ERTA prepared by the staff of the Joint Committee on Taxation states as follows:

> The recovery period and method the taxpayer selects must be used for the building as a whole, including all structural components that are <u>real property</u> (e.g., wiring, plumbing, etc.). Component depreciation no longer may be used. <u>The distinction between a structural component of a building, which is section 1250 property, and an item of property that is section 1245 property remains the same as under prior law.</u> * * * [Staff of the Joint Comm. on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 85 (J. Comm. Print 1981). Emphasis added.]

Additionally, see Staff of the Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 90 (J. Comm. Print 1987), summarizing the prohibition against the component method of depreciation under ACRS as follows: "Component cost recovery was not permitted under ACRS. Thus, the same recovery period and method had to be used for a building as a whole, including all structural components."; see also H. Rept. 99-426, at 138 (1985), 1986-3 C.B. (Vol. 2) 138; S. Rept. 99-313, 99th Cong., 2d Sess. 88 (1986), 1986-3 C.B. (Vol. 3) 88.

We note further that our understanding of the statutory provision comports with the construction given that provision in

the report relating to the Small Business Job Protection Act of 1996, Pub. L. 104-188, 110 Stat. 1755,[39] wherein the Senate Finance Committee, in explaining present law relating to depreciation of leasehold improvements, states as follows:

> If the improvement is characterized as tangible personal property, ACRS depreciation is calculated using the shorter recovery periods and accelerated methods applicable to such property.  The determination of whether certain improvements are characterized as tangible personal property or as nonresidential real property often depends on whether or not the improvements constitute a "structural component" of a building (as defined by Treas. Reg. sec. 1.48-1(e)(1)). See, for example, Metro Natl. Corp. [v. Commissioner], 52 TCM 1440 (1987) [T.C. Memo. 1987-38]; King Radio Corp. [v. United States], 486 F.2d 1091 (10th Cir. 1973); Mallinckrodt, Inc. [v. Commissioner], 778 F.2d 402 (8th Cir. 1985) [affg. per curiam T.C. Memo. 1984-532] (with respect various leasehold improvements).  [S. Rept. 104-281, at 16 n.5 (1996).]

We additionally note that for purposes of ascertaining ACRS recovery periods section 1245 class property has the same definition as personal property described in section 1.48-1(c), Income Tax Regs., which comports with respondent's own interpretation of section 168(f) promulgated in proposed regulations under section 168 issued during 1984.[40]  See 49 Fed.

---

[39]  We recognize that it is well settled that the view of a later Congress as to the construction of a statute or a regulation adopted is not entitled to great weight.  E.g., CSI Hydrostatic Testers, Inc. v. Commissioner, 103 T.C. 398, 415 (1994), affd. 62 F.3d 136 (5th Cir. 1995); Mars, Inc. v. Commissioner, 88 T.C. 428, 435 (1987).

[40]  The proposed regulations have not been amended to reflect changes to sec. 168 made by the TRA-1986 and subsequent legislation.  No final or temporary regulations under sec. 168 relating to the issues in the instant opinion have been issued.
(continued...)

Reg. 5940-5971 (Feb. 16, 1984). Section 1.168-2(e), Proposed Income Tax Regs., 49 Fed. Reg. 5946 (Feb. 16, 1984), provides in pertinent part as follows "((e) Components and improvements--(1) Component cost recovery not permitted. In general, the unadjusted basis of structural components (as defined in § 1.48-1(e)(2)) of a building must be recovered as a whole. Thus, the same recovery period and method must be used for all structural components, and such components must be recovered as constituent parts of the building of which they are a part. * * *" [Emphasis added.])

Accordingly, we conclude that the precedent that has been developed to ascertain whether property constitutes eligible section 38 property for purposes of ITC is equally applicable to ascertain whether property constitutes section 1245 class property for purposes of ACRS. See also Schrum v. Commissioner, T.C. Memo. 1993-124 (to the extent that property does not qualify as eligible section 38 property under section 48, the property cannot constitute section 1245 class property.)

---

40 (...continued)
We recognize that the proposed regulations "carry no more weight than a position advanced on brief by the respondent". Zinniel v. Commissioner, 89 T.C. 357, 369 (1987), quoting F.W. Woolworth Co. v. Commissioner, 54 T.C. 1233, 1265-1266 (1970).

MACRS

MACRS does not utilize the terms "section 1245 class property" or "section 1250 class property".[41]  Rather, MACRS assigns property to recovery periods on the basis of class lives. To constitute 5-year property, the disputed property items must have a class life of more than 4 years but less than 10 years. Sec. 168(e)(1).  To constitute nonresidential real property, the disputed property items must be section 1250 property with a class life of more than 27.5 years.  Sec. 168(e)(2).

Section 168(i)(12) provides that "The terms 'section 1245 property' and 'section 1250 property' have the meanings given such terms by sections 1245(a)(3) and 1250(c), respectively."  As we discussed supra, section 1250(c) excludes from the term "section 1250 property", "section 1245 property, as defined in section 1245(a)(3)".

From that statutory provision, we conclude that, as with ACRS, the MACRS statutory language manifests a congressional intent to retain the prior law distinction between components

---

[41]   Although the terms "section 1245 class property" and "section 1250 class property" are not utilized in MACRS, as will be discussed in more detail infra, the disputed property items involved in the instant case for taxable years ended 1986 and 1987 would have constituted either section 1245 class property or section 1250 class property, as applicable, had ACRS continued to be in effect for those taxable years.  Consequently, for convenience, we continue to use the terms "section 1245 class property" and "section 1250 class property", where appropriate, to refer to property items for which MACRS applies as well as to the property items for which ACRS applies.

that constitute section 1250 class property and property items that constitute section 1245 class property. The legislative history of MACRS does not reveal a contrary intention.

In support of the position that an analysis based on ITC is inappropriate for cost recovery purposes, respondent relies on language contained in Grinalds v. Commissioner, T.C. Memo. 1993-66, that "the 'sole justification' test relates to the investment tax credit, which has provisions and policies of its own, and it provides only limited guidance, if any, in interpreting section 168(i)(6), the statute directly involved here." The "sole justification" test refers to the provision in section 1.48-2(e), Income Tax Regs., which specifically excludes from the definition of a structural component "machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery." Sec. 1.48-2(e), Income Tax Regs. In Grinalds, we did not focus on the definition of section 1245 class property and section 1250 class property. Therefore that case is distinguishable and inapplicable to the issue of whether tangible property constitutes section 1245 class property or section 1250 class property for purposes of ACRS and MACRS.

Based on the foregoing, we conclude that the tests developed to ascertain whether property constituted tangible personal

property for purposes of ITC equally are applicable to decide whether the property constitutes tangible personal property for purposes of MACRS. Accordingly, we conclude that, to the extent a disputed property item would have qualified as tangible personal property for ITC, that property also will qualify as tangible personal property for purposes of ACRS and MACRS.

Additional Arguments

Respondent further contends that the tests developed to decide whether property qualified for ITC are inapplicable to ascertain ACRS recovery classes or MACRS recovery periods because ITC and ACRS and MACRS accomplish their capital cost incentives in a different manner and focus on different factors. Respondent's arguments in support of that contention are premised on the position that the ACRS and MACRS depreciation deductions should be tied to the useful life of the property involved. We rejected a similar position in Simon v. Commissioner, 103 T.C. 247 (1994), affd. 68 F.3d 41 (2d Cir. 1995), and Liddle v. Commissioner, 103 T.C. 285 (1994), affd. 65 F.3d 329 (3d Cir. 1995), and we reject it here.

Other arguments raised by respondent in support of the position that the tests used to ascertain whether property qualifies as tangible personal property for ITC purposes are not applicable for purposes of ACRS and MACRS also are without merit, and we do not address them here.

Respondent contends alternatively that all of the disputed property items are structural components under an ITC analysis and, consequently, constitute section 1250 class property. We now address that alternative position.

Classification of the Disputed Property Items as Section 1245 Class Property or Section 1250 Class Property.

In General

As discussed supra, the classification of disputed property items as section 1245 class property, depreciable over a 5-year recovery period, or section 1250 class property, depreciable over the life of the related structure, depends upon a decision as to whether the respective items constitute tangible personal property within the meaning of section 1.48-1(c), Income Tax Regs., which would be section 1245 class property, or structural components of the buildings to which they relate within the meaning of section 1.48-1(e)(2), Income Tax Regs., which would be section 1250 class property. See also secs. 1.1245-3(b)(1), (c), 1.1250-1(e)(3), Income Tax Regs.

Tangible Personal Property

The regulations define tangible personal property to include "any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures)". Sec. 1.48-1(c), Income Tax Regs. Local law does not control for purposes of determining whether property is or is

not "tangible" or "personal".  Id.  The term "tangible personal property" is not intended to be defined narrowly and includes assets accessory to the operation of a business.  Illinois Cereal Mills, Inc. v. Commissioner, 789 F.2d 1234, 1237 (7th Cir. 1986), affg. T.C. Memo. 1983-469; Metro Natl. Corp. v. Commissioner, T.C. Memo. 1987-38; see also S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 858; Morrison, Inc. v. Commissioner, T.C. Memo. 1986-129, affd. 891 F.2d 857 (11th Cir. 1990).[42]

In Whiteco Indus., Inc. v. Commissioner, 65 T.C. 664, 672-673 (1975), we listed the following factors to consider in resolving whether property is inherently permanent and, thus, not tangible personal property within the meaning of section 1.48-1(c), Income Tax Regs.:  (1) Is the property capable of being

_____

[42]   S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 722, in defining "section 38 property" for purposes of the investment tax credit, stated in pertinent part as follows:

   Except for the exclusions noted below, all tangible
   personal property qualifies as section 38 property.
   * * * Tangible personal property is not intended to be
   defined narrowly here, nor to necessarily follow the
   rules of State law.  It is intended that assets
   accessory to a business such as grocery store counters,
   printing presses, individual air-conditioning units,
   etc., even though fixtures under local law, are to
   qualify for the credit.  Similarly, assets of a
   mechanical nature, even though located outside a
   building, such as gasoline pumps, are to qualify for
   the credit.  Real property (other than buildings and
   structural components) which qualifies as integral
   parts of categories referred to above includes such
   assets as blast furnaces, oil and gas pipelines,
   railroad track and signals, and fences used in
   connection with raising cattle.

moved, and has it in fact been moved? (2) Is the property designed or constructed to remain permanently in place? (3) Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved? (4) How substantial a job is removal of the property and how time-consuming is it? Is it "readily removable"? (5) How much damage will the property sustain upon its removal? and (6) What is the manner of affixation of the property to the land?

Movability itself is not the controlling factor in deciding whether the property lacks permanence. Kramertown Co. v. Commissioner, 488 F.2d 728, 731 (5th Cir. 1974), affg. T.C. Memo. 1972-239; see also Consolidated Freightways v. Commissioner, 708 F.2d 1385, 1390 (9th Cir. 1983) (a variety of factors are considered, including, where possible, the function and design of the component in issue, the intent of the taxpayer in installing the component, and the effect of removal of the component on the building), affg. in part and revg. in part 74 T.C. 768 (1980); Everhart v. Commissioner, 61 T.C. 328, 331 (1973) (moveability per se does not determine whether or not property is personal property); Dixie Manor, Inc. v. United States, 44 AFTR 2d 79-5442, 79-2 USTC par. 9469 (W.D. Ky. 1979) (fact that walls often are removed because of a change in design by itself is not sufficient), affd. without published opinion 652 F.2d 57 (6th

Cir. 1981). The fact that an item is not readily reusable in another location is evidence supporting the conclusion that it is to be treated as permanent in its present location. Mallinckrodt, Inc. v. Commissioner, 778 F.2d 402, 403 (8th Cir. 1985), affg. per curiam T.C. Memo. 1984-532.

Structural Components

Section 1.48-1(e)(2), Income Tax Regs., explains the meaning of "structural components" by way of example rather than by definition as follows:

> (2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as panelling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs.

Accordingly, an item constitutes a structural component of a building if the item relates to the operation and maintenance of the building. Sec. 1.48-1(e)(2), Income Tax Regs. The "sole justification" test set forth in section 1.48-1(e)(1), Income Tax Regs., excludes from the term "structural component" only machinery that is required to meet the temperature and humidity

requirements of other machinery.  See <u>Piggly Wiggly S., Inc. v. Commissioner</u>, 84 T.C. 739, 750-753 (1985), affd. 803 F.2d 1572 (11th Cir. 1986); <u>Texas Instruments, Inc. v. Commissioner</u>, T.C. Memo. 1992-306; <u>Morrison, Inc. v. Commissioner</u>, <u>supra</u>.

Applying the foregoing general principles, we next consider the appropriate individual categories for the disputed property items.  Before we address the substantive issues, however, we must decide an evidentiary matter which was raised at trial.

At trial, petitioners objected to the admission of portions of the report prepared by respondent's expert, Steve Wilgus (Mr. Wilgus), which petitioners contend contains legal conclusions. Respondent contends that the contested materials do not constitute legal conclusions.  We took petitioners' objections under advisement.

Testimony of a witness qualified by knowledge, skill, experience, training, or education is admissible whenever that scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to decide a fact in issue.  Fed. R. Evid. 702.  Testimony that expresses a legal conclusion and does not assist the trier of fact is not admissible.  See <u>Heflin v. Stewart County, Tenn.</u>, 958 F.2d 709, 715-716 (6th Cir. 1992); <u>Davis v. Combustion Engg., Inc.</u>, 742 F.2d 916, 919 (6th Cir. 1984); <u>Laureys v. Commissioner</u>, 92 T.C. 101, 126-129 (1989); Weinstein's Federal Evidence, sec.

704.04[2][a], at 704-10-704-11 (2d ed. 1997); see also Fed. R.
Evid. 701, 702; Snap-Drape, Inc. v. Commissioner, 98 F.3d 194,
197-198 (5th Cir. 1996), affg. 105 T.C. 16 (1995); Berry v. City
of Detroit, 25 F.3d 1342, 1353-1354 (6th Cir. 1994); Molecular
Tech. Corp. v. Valentine, 925 F.2d 910, 919 (6th Cir. 1991);
Adalman v. Baker, Watts & Co., 807 F.2d 359, 365-368 (4th Cir.
1986).[43]

We conclude that Mr. Wilgus' report states legal conclusions
applying law to facts and that those legal conclusion are not
helpful to the Court.  Consequently, we disregard them.[44]

Additionally, in support of their respective positions, the
parties presented expert testimony at trial and in reports
concerning the nature of the disputed property items.  Expert
testimony may be in the form of an opinion or in the expression
of a dissertation or exposition of scientific or other principles
relevant to the case, which the finder of fact may apply to the
facts.  Fed. R. Evid. 702, advisory comm. note, 28 U.S.C. App. at
8871 (1994).  Opinion testimony of an expert not supported by an
adequate foundation of relevant facts, data, or opinions,
however, is inadmissible conjecture or speculation.  See Randolph

[43]  See also Estate of Carpenter v. Commissioner, T.C. Memo.
1993-97.

[44]  See also Shoney's S., Inc. v. Commissioner, T.C. Memo. 1984-
413 n.2, wherein we also disregarded legal conclusions contained
in a report prepared by Mr. Wilgus.

v. Laeisz, 896 F.2d 964, 967-968 (5th Cir. 1990); Twin City Plaza, Inc. v. Central Sur. & Ins. Corp., 409 F.2d 1195, 1200 (8th Cir. 1969); Graham, Federal Practice and Procedure, sec. 6641, at 251-252 (Interim ed. 1992).  An expert may base an opinion or inference on facts that the expert knows from first hand observation, that are in the record and made known to the expert, or that, although not in the record, are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."  Fed. R. Evid. 703; see also Ramsey v. Culpepper, 738 F.2d 1092, 1101 (10th Cir. 1984); In re Aircrash in Bali, Indonesia on April 22, 1974, 684 F.2d 1301, 1314 (9th Cir. 1982); Baumholser v. Amax Coal Co., 630 F.2d 550, 552-553 (7th Cir. 1980).

Although otherwise inadmissible data underlying an expert's opinion may be admitted at trial, the use of that data is limited to explaining the expert's reasoning, and is not admitted as substantive evidence.  Fed. R. Evid. 703, 705; Engebretsen v. Fairchild Aircraft Corp., 21 F.3d 721, 728-729 (6th Cir. 1994); United States v. Wright, 783 F.2d 1091, 1100 (D.C. Cir. 1986); Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1261-1262 (9th Cir. 1984).  Factual allegations that are not otherwise in the record that are relied upon by an expert witness may be admitted as substantive evidence only if proper foundational requirements are satisfied; i.e., where the expert testifies from personal

knowledge of the facts relayed.  See Fed. R. Evid. 602.
Accordingly, to the extent that the testimony of an expert states
factual allegations that are not otherwise properly in the
record, i.e., no foundation was laid establishing that the
witness had an opportunity to observe and actually did observe
the fact to which the witness testified, we disregard such
testimony.

Although we have considered and given due weight to the
conclusions of the experts, we do not set forth infra those
conclusions except where we believe it will help explain our
rationale for finding that a specific disputed property item
constitutes personal property or a structural component.  We turn
next to consideration of the appropriate categories for the
disputed items.

1.[45]  Primary and Secondary Electrical Distribution Systems

The primary and secondary electrical distribution systems
(Property Unit 1900) include the main panels, main motor control
centers, transformers, the secondary distribution panels, and
related wiring and conduit.  See supra pp. 9-12.  The parties
have stipulated to the portion of the electrical load conveyed by
the primary and secondary electrical distribution systems to
hospital equipment and to the portion conveyed to items related

_____

[45]  Our numbering of the groups of disputed property items
considered in this Opinion corresponds to the numbering utilized
by petitioners in their briefs.

to the operation and maintenance of petitioners' buildings.  See
supra p. 12.

Petitioners contend that the portion of the primary and
secondary electrical distribution systems which carry electrical
loads to particular items of business equipment constitutes
section 1245 class property within the meaning of sections 1.48-
1(c) and 1.1245-3(b), Income Tax Regs., because that portion of
the electrical distribution systems does not relate to the
operation or maintenance of a building.  Respondent counters that
those disputed property items are structural components of the
buildings to which they relate because they are inherently
permanent and are not readily removable.

Respondent agrees that our decision in Morrison, Inc. v.
Commissioner, supra, as affirmed by the Court of Appeals for the
Eleventh Circuit, provides authority for petitioners' position
that the primary and secondary electrical distribution systems
are not structural components to the extent of the load
percentages that the parties stipulated are carried to equipment.
Our holding in Morrison follows our holding in Scott Paper Co. v.
Commissioner, 74 T.C. 137, 186-187 (1980), that the portion of
the taxpayer's primary electrical distribution system which did
not relate to the overall operation or maintenance of buildings
constituted tangible personal property under section 48(a)(1)(A)
and therefore was eligible for ITC.  Respondent, however, urges

the Court to disavow <u>Scott Paper Co. v. Commissioner</u>, <u>supra</u>, and its progeny, and instead to follow the reasoning of <u>A.C. Monk & Co. v. United States</u>, 686 F.2d 1058, 1065-1066 (4th Cir. 1982) (no justification for allocating portions of a single electrical system; components of electrical system are structural components if they can be reasonably adapted to general uses), or of <u>Illinois Cereal Mills, Inc. v. Commissioner</u>, 789 F.2d at 1244 (electrical distribution system was "other tangible property" under section 48(a)(1)(B)).[46]

---

[46]     Absent a stipulation to the contrary, the instant case is appealable to the Court of Appeals for the Sixth Circuit and therefore is not controlled by the decisions of the Courts of Appeals for the Fourth Circuit (<u>A.C. Monk & Co. v. United States</u>, 686 F.2d 1058 (4th Cir. 1982)) or Seventh Circuit (<u>Illinois Cereal Mills, Inc. v. Commissioner</u>, 789 F.2d 1234 (7th Cir. 1986), affg. T.C. Memo. 1983-469).  See <u>Golsen v. Commissioner</u>, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).  The Court of Appeals for the Sixth Circuit has not decided the issue; accordingly, we decide the instant case as we think proper. <u>Lardas v. Commissioner</u>, 99 T.C. 490, 498 (1992).
     We note, however, that  in <u>Morrison, Inc. v. Commissioner</u>, 891 F.2d 857, 863 n.* (11th Cir. 1990), the Court of Appeals for the Eleventh Circuit stated as follows:

     *We note that only <u>Scott Paper</u> is directly on point.  In <u>Scott Paper</u>, the Tax Court analyzed a primary electrical system to determine whether it partially qualified as tangible personal property under section 48(a)(1)(A).  The <u>Illinois Cereal</u> and the <u>Monk</u> courts, however, discussed whether portions of primary electrical systems constituted other tangible personal property under section 48(a)(1)(B). Although the <u>Illinois Cereal</u> court stated at the end of its opinion that the taxpayer's primary electrical system did not constitute tangible personal property, the court did not squarely face the issue.  See <u>Illinois Cereal</u>, 789 F.2d at 1239 ("[Taxpayer] <u>does</u> <u>not</u> <u>contend</u> that its electrical distribution system is 'tangible personal property' under

(continued...)

Respondent contends further that the disputed property items in the subject category are distinguishable from the primary and secondary electrical distribution property items involved in Scott Paper Co. v. Commissioner, supra, because in that case the electrical components were readily removable, they were not inherently permanent, they were inextricably linked to and installed in conjunction with the addition of particular pieces of machinery, and most of the electricity carried by the electrical components was conveyed to the new equipment.

In Morrison, Inc. v. Commissioner, T.C. Memo. 1986-129, we explained our rationale for finding a portion of the primary and secondary electrical system in Scott Paper Co. eligible property for ITC as follows:

> In Scott Paper Co., we concluded that the components of the taxpayer's primary electric system which supplied the electric needs of process machinery rather than contributing to the overall operation or maintenance of buildings, was not an inherently permanent structure and the taxpayers were entitled to the investment tax credit on these components. In reaching this conclusion we placed great emphasis on the language in section 1.48-1(e)(2), Income Tax Regs., which defines "structural components" by listing examples and including as the last line of the regulation "and other components relating to the operation or maintenance of a building." In Scott Paper Co., supra at 183, we characterized that phrase as follows:

---

46 (...continued)
    section 48." (Emphasis added)).

Thus, it is not clear whether Illinois Cereal actually supports respondent's position.

a descriptive phrase intended to present the basic
test used for identifying structural components.
The preceding elements are examples of items which
meet the test as a general rule.  Items which
occur in an unusual circumstance and do not relate
to the operation or maintenance of a building
should not be structural components despite being
listed in section 1.48-1(e)(2), Income Tax Regs.
* * *

We also quoted the Technical Explanations of the Revenue Act
of 1962 which explained the language which was incorporated
in the regulation as follows:

The term "structural components" of a building
includes such parts of the building as central
air-conditioning and heating systems, plumbing,
and electric wiring and lighting fixtures,
relating to the operation [or] maintenance of the
building.  [H. Rept. 1447, 87th Cong., 2d Sess.
(1962), 1962-3 C.B. 503, 516; S. Rept. 1881, 87th
Cong., 2d Sess. (1962), 1962-3 C.B. 843, 859.]

In accordance, we concluded that property fails to qualify
for the credit if it relates to the overall operation or
maintenance of a building rather than being used to aid in
the employment of a particular function or particular piece
of property.  See Central Citrus Co. v. Commissioner, 58
T.C. 365, 374 (1972).

We focused on the ultimate uses of power at the
taxpayer's facility in Scott Paper Co. and distinguished the
power used in the overall operation or maintenance such as
lighting, heating, ventilation and air-conditioning of the
building and the power used to operate the taxpayer's
machinery.  Scott Paper Co. v. Commissioner, supra at 183-
184.  We thus concluded in Scott Paper Co. that:

To the extent that the primary electric carried
electrical loads to be used for pulp and paper
production processes or other such qualifying
uses, the investment credit will be allowed for
the primary electric improvements.
To the extent that the primary electric
improvements relate to the overall operation [or]
maintenance of buildings, they are structural
components of such buildings, and they do not qualify
as tangible personal property.

We find no material differences between the facts in the instant case and those facts present in Scott Paper Co. v. Commissioner, supra, and Morrison, Inc. v. Commissioner, supra, relating to the primary and electrical distribution systems.  For the reasons previous articulated in both of those case, we conclude that the portion of the cost of the primary and secondary electrical distribution systems in petitioners' hospitals which is equal to the percentage of the electrical load carried to those systems allocable to the hospitals' equipment, as stipulated by the parties, constitutes section 1245 class property, depreciable over a 5-year recovery period.

2.  Branch Electrical Wiring and Connections and Special Electrical Equipment

The branch electrical wiring and connections (hereinafter branch wiring) relate to several items of hospital equipment and are contained in many different property units including controls, battery packs, and battery chargers for the emergency power generation systems (Property Unit 2200); x-ray film processing equipment (Property Unit 2244); illuminated emergency entrance signs and illuminated hospital front entrance signs (Property Unit 2320); medical gas control equipment and medical gas alarm equipment (Property Unit 3026); hospital kitchen equipment (Property Unit 3075); equipment located in the hospital laboratory and maintenance shop areas (Property Unit 3195); synchronously wired clock systems (Property Unit 3280); air

conditioners located in the hospital computer rooms (Property Unit 3292); hospital central sterilization equipment (Property Unit 3298); items of hospital equipment located in the operating rooms, recovery rooms, intensive care units, infant nurseries, radiology areas, patient rooms, laboratories, and kitchens (Property Unit 4040).  See supra pp. 12-16.

The parties have stipulated that 100 percent of the electrical load carried by the branch wiring relating to the controls, battery packs, and battery chargers for the emergency power generation systems, the x-ray film processing equipment, the illuminated emergency entrance signs and the illuminated hospital front entrance signs, the medical gas control equipment and medical gas alarm equipment, the synchronously wired clock systems, the air conditioners located in the hospital computer rooms, and the hospital central sterilization equipment, is conveyed to the particular items of equipment to which they relate.  The parties agree further that the branch wiring is necessary and required for the operation and use of the items to which they relate and, during the years in issue, was used only with those items.  The parties additionally have stipulated that all of the electrical receptacles in dispute are used to provide localized electrical service for specific items of equipment located in the kitchens, patient rooms, laboratories, and maintenance shop areas of petitioners' hospitals, which equipment

respondent agrees is 5-year personal property.  We refer to the branch wiring and special electrical equipment in issue in the subject category collectively as the branch electrical systems.

Petitioners contend that the branch electrical systems are section 1245 class property pursuant to the reasoning of Scott Paper Co. v. Commissioner, 74 T.C. 137 (1980), and its progeny, as well as Rev. Rul. 66-299, 1966-2 C.B. 14.[47]  Petitioners contend that the parties agree that virtually every item to which the branch wiring relates was appropriately classified as section 1245 class property.

Respondent, however, contends that the disputed property items in the subject category are inherently permanent and are identified as a structural component (electric wiring) in section 1.48-1(e)(2), Income Tax Regs.  On brief, respondent segregates the disputed property items into individual segments of conduit, electrical wiring, junction boxes, outlets, and receptacles.

_____

[47]    A revenue ruling reflects respondent's position on an issue and is not binding precedent upon the Court.  See Halliburton Co. v. Commissioner, 100 T.C. 216, 232 (1993), affd. without published opinion 25 F.3d 1043 (5th Cir. 1994); Stark v Commissioner, 86 T.C. 243, 250-251 (1986); Neuhoff v. Commissioner, 75 T.C. 36, 46 (1980), affd. 669 F.2d 291 (5th Cir. 1982).  We disregard a revenue ruling, if it conflicts with the statute it supposedly interprets, with the statute's legislative history, or if it is otherwise unreasonable.  E.g., Threlkeld v. Commissioner, 848 F.2d 81, 84 (6th Cir. 1988), affg. 87 T.C. 1294 (1986). However, we may adopt its reasoning if we agree that the ruling correctly applies the law.  Estate of Lang v. Commissioner, 64 T.C. 404, 406-407 (1975), affd. in part and revd. in part 613 F.2d 770, 776 (9th Cir. 1980); Keating v. Commissioner, T.C. Memo. 1995-101.

Respondent contends that the conduit is designed to remain in place throughout its expected useful life, is identical to other conduit which petitioners have agreed is a structural component, and is typical of electrical conduit used at other commercial establishments. Respondent contends that the electrical wiring is not designed or installed with a particular piece of equipment, is not easily removable, and is not economically practicable to reuse. Respondent contends that none of the electrical outlets, receptacles, and junction boxes are inextricably linked to specific items of machinery, they are not moved, they are typical of outlets, receptacles, and junction boxes used in commercial facilities, and they relate to the operation of the buildings in that they provide points for the provision of power for many property items including employee radios in the laboratories and power tools in the shop areas.

As we understand respondent's position, respondent agrees that the disputed property items in the subject category are necessary for, and used exclusively with, the operation of various items of equipment. Nevertheless, respondent contends that the branch electrical systems are structural components because they were not designed for or installed with the specific equipment to which they relate, they are adaptable for other purposes, are composed of standard electrical supplies, have useful lives not inextricably linked to the specific equipment

with which they are used, and are not readily removable. Additionally, with regard to the electrical outlets, receptacles, and junction boxes located in laboratory and shop areas, respondent asserts that those disputed property items may be used to power nonhospital equipment or equipment relating to the operation or maintenance of the buildings. To decide whether the disputed property items in the subject category constitute personal property or structural components of the buildings to which they relate, we apply the reasoning in Scott Paper Co. v. Commissioner, supra, and cases following its rationale.

In Scott Paper Co. v. Commissioner, 74 T.C. at 182-183, we noted that even though section 1.48-1(e)(2), Income Tax Regs., lists items such as "wiring and lighting fixtures" in describing structural components, to constitute a structural component of a building, the item nonetheless must relate to the operation or maintenance of the building. Subsequently, in Morrison, Inc. v. Commissioner, T.C. Memo. 1986-129, we found that much of the electrical distribution systems constituted personal property. We stated:

> Respondent points out that the reasonable adaptability of
> the electrical distribution system with minimal effort to
> accommodate another cafeteria, a restaurant or a retail
> sales establishment such as a furniture store, indicates
> that the system relates to the overall operation or
> maintenance of the building rather than relating to the
> function of specific pieces of kitchen machinery or
> equipment. Respondent recognizes that his argument is
> contrary to our holding in Scott Paper Co., supra.
> Following our holding in Scott Paper Co. v. Commissioner, 74

T.C. 137, 184 (1980), we focus on the ultimate use of the electrical power in petitioners' cafeterias in order to determine whether the electrical distribution system constitutes a structural component. An allocation should then be made based on the qualifying and nonqualifying uses of the power.

Similarly, in Duaine v. Commissioner, T.C. Memo. 1985-39, we analyzed various items of property contained in a fast food restaurant to determine whether they qualified for ITC. We followed the reasoning of Scott Paper Co. v. Commissioner, supra, in finding that electrical outlets and conduits that provided localized power sources for the lessee's specialized restaurant equipment constituted personal property.

In Rev. Rul. 66-299, 1966-2 C.B. at 16, respondent concluded that:

> special electrical or plumbing connections which are necessary to and are used directly with a specific item of machinery or equipment, or between specific items of individual, machinery or equipment, are not structural components of the building, but are essentially items of machinery or equipment, and qualify as section 38 property for investment credit purposes.

We analyzed that language in Central Citrus Co. v. Commissioner, 58 T.C. at 374, and stated:

> Such language creates a clear distinction between property used in the general overall operation of a building * * * and that property which is utilized to aid in the employment of a particular function or particular piece of property. We find this particular dichotomy to be both reasonable and sound and in agreement with congressional intent. * * * [Citations omitted.]

Accordingly, we held in Central Citrus Co. that distribution system adapters, contractors, fuses, starters, switches, and

relays served specialized functions or specific equipment used in the taxpayer's citrus fruit processing business and therefore qualified for ITC.

Respondent argues that the disputed property items comprising the branch electrical systems are not identical to the primary and secondary electrical systems involved in Scott Paper Co. v. Commissioner, supra, and Morrison, Inc. v. Commissioner, supra, or to the electrical connections involved in Duaine v. Commissioner, supra, or to the "special electrical or plumbing connections" described in Central Citrus Co. v. Commissioner, supra, and Rev. Rul. 66-299, supra. We, however, conclude that there are no material differences among those items and the disputed property items in the subject category.

Respondent argues further that the wiring and conduit located in the walls or floors of the hospitals are inherently permanent because they are not movable. Movability, however, is not the sole determinant as to what constitutes section 1245 personal property. Kramertown Co. v. Commissioner, 488 F.2d at 731; Consolidated Freightways v. Commissioner, 708 F.2d at 1390; Everhart v. Commissioner, 61 T.C. at 331; Dixie Manor, Inc. v. United States, 44 AFTR 2d at 79-5444 to 79-5446, 79-2 USTC par. 9469. The fact that some of the wiring and conduit is contained in the walls and floors of the hospitals is not relevant in determining whether those items are personal property. We look

to the ultimate use of the electrical power conveyed by the branch electrical systems to decide whether the disputed property items constitute structural components or personal property. Scott Paper Co. v. Commissioner, supra; Morrison, Inc. v. Commissioner, supra.

From the foregoing, we learn that a disputed property item constitutes a structural component to the extent that it furnishes electrical power for a function or equipment that relates to the operation or maintenance of a building. Conversely, to the extent that a disputed property item furnishes electrical power for a function or equipment that does not relate to the operation or maintenance of a building, the disputed property item constitutes tangible personal property. Scott Paper Co. v. Commissioner, supra; Central Citrus Co. v. Commissioner, supra; see also Texas Instruments, Inc. v. Commissioner, supra; Morrison, Inc. v. Commissioner, supra; Duaine v. Commissioner, supra.

The x-ray film processing equipment (Property Unit 2244), medical gas control equipment and medical gas alarm equipment (Property Unit 3026), and hospital central sterilization equipment (Property Unit 3298) aid in the rendition of healthcare services and, therefore, the branch electrical systems relating to that equipment do not relate to the operation or maintenance of the buildings. Branch electrical systems relating to items of

hospital equipment located in the operating room, recovery room,
intensive care units, infant nurseries, radiology areas, patient
rooms, laboratories, and kitchens (Property Unit 4040) also are
property items related to furnishing medical services rather than
to providing building services.  Accordingly, we hold that the
branch electrical systems relating to Property Units 2244, 3026,
3298, and 4040 constitute tangible personal property, and that
they are depreciable over a 5-year recovery period.

The parties agree that the emergency generator (Property
Unit 2200) and emergency entrance signs and illuminated hospital
front entrance signs (Property Unit 2320) are 5-year property.
In our view, those items, as well as the hospital kitchen
equipment (Property Unit 3075), constitute assets accessory to
the conduct of petitioners' healthcare business, within the
meaning of S. Rept. 1881, 87th Cong., 2d Sess. (1962), supra,
1962-3 C.B. 707, 722, and, consequently, they do not relate to
the operation or maintenance of the buildings.  See Morrison,
Inc. v. Commissioner, supra (emergency lighting qualifies as
asset accessory to a business); S. Rept. 95-1263, at 117 (1978),
supra, 1978-3 C.B. (Vol. 1) 315, 415[48] (special lighting,

---

[48]   In connection with the enactment of the Revenue Act of 1978,
Pub. L. 95-600, 92 Stat. 2763, the report of the Senate Finance
Committee stated among other things as follows:

the committee wishes to clarify present law by stating that
tangible personal property already eligible for the
(continued...)

identity symbols, and signs (except billboards) are tangible

personal property).  The parties agree further that the computer-

room air conditioners (Property Unit 3292) are 5-year property,

presumably because they satisfy the "sole justification" test of

section 1.48-1(e)(2), Income Tax Regs,[49] and they consequently

---

[48]  (...continued)
     investment tax credit includes special lighting (including
     lighting to illuminate the exterior of a building or store,
     but not lighting to illuminate parking areas), false
     balconies and other exterior ornamentation that have no more
     than an incidental relationship to the operation or
     maintenance of a building, and identity symbols that
     identify or relate to a particular retail establishment or
     restaurant such as special materials attached to the
     exterior or interior of a building or store and signs (other
     than billboards).  Similarly, floor coverings which are not
     an integral part of the floor itself such as floor tile
     generally installed in a manner to be readily removed (that
     is it is not cemented, mudded, or otherwise permanently
     affixed to the building floor but, instead, has adhesives
     applied which are designed to ease its removal), carpeting,
     wall panel inserts such as those designed to contain
     condiments or to serve as a framing for pictures of the
     products of a retail establishment, beverage bars,
     ornamental fixtures (such as coats-of-arms), artifacts (if
     depreciable), booths for seating, movable and removable
     partitions, and large and small pictures of scenery,
     persons, and the like which are attached to walls or
     suspended from the ceiling, are considered tangible personal
     property and not structural components.  Consequently, under
     existing law, this property is already eligible for the
     investment tax credit.  [S. Rept. 95-1263, at 117, 1978-3
     C.B. (Vol. 1) 315, 415.]


[49]  Sec. 1.48-1(e)(2), Income Tax Regs., provides in pertinent
part as follows:

          the term "structural components" does not
          include machinery the sole justification for
          the installation of which is the fact that
                                        (continued...)

also would not relate to the operation or maintenance of the buildings. See Piggly Wiggly S., Inc. v. Commissioner, 84 T.C. at 748-756 (HVAC units installed to meet temperature and humidity requirements of refrigeration equipment of grocery stores qualify as tangible personal property). The branch electrical systems relating to those items of equipment similarly do not relate to the operation or maintenance of petitioners' buildings. Accordingly, we hold that the branch electrical systems relating to Property Units 2200, 2320, 3292, and 3075 also constitute tangible personal property, and that they are depreciable over a 5-year recovery period.

The subject category also includes synchronously wired clock systems (Property Unit 3280). Petitioners' expert, William J. Neiman (Mr. Neiman), states that the clock system, located throughout the hospital, includes clocks, timers, and personnel time recorders that insure continuity in timekeeping. He explains that the clock system is not found in most buildings but

---

49 (...continued)
such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential.

typically only in facilities where the routine nature and regularity of medical procedures is inherent to the business of the facility. Mr. Neiman further states that the timekeeping system is necessary for monitoring the duration and frequency of patient symptoms and timing the administration of medical treatments. Respondent's expert, Stephen A. Wilgus, discussed the conduit, wiring, and electrical outlets comprising the branch electrical systems, but he did not address the classes of assets to which the disputed property items relate. Although it seems that synchronized timekeeping systems are not unique to the healthcare business, we conclude that the synchronized clocks relate to the operations carried on within petitioners' buildings and not to the operation or maintenance of petitioners' buildings. Consequently, we hold that the branch electrical systems relating to the synchronized clocks also constitute personal property and that they also are depreciable over a 5-year recovery period.

Lastly, the subject category includes electrical outlets, receptacles, and junction boxes located in laboratory and shop areas. To the extent that they are used to power employee personal equipment or equipment relating to the operation or maintenance of the buildings, they do not constitute personal property. Rather, they are structural components of the buildings. To the extent that they are used to power equipment

that is not employee owned or that does not relate to the operation or maintenance of petitioners' buildings, however, they do constitute personal property. Petitioners, however, have not produced evidence demonstrating which electrical outlets, receptacles, and junction boxes are used for a qualified purpose, and we have no basis to make that determination. Accordingly, we sustain respondent's determination that those disputed property items must be depreciated over the same recovery period as the building to which they relate.

3. Wiring and Related Property Items Relating to Television Equipment

The disputed property items in the subject category (Property Unit 2340) consist of wiring and related property items that relate to the television antennae and television sets located in the hospitals. See supra pp. 16-17.

Petitioners contend that the branch wiring relating to the television equipment is section 1245 class property, depreciable over 5-year periods, pursuant to the reasoning of Scott Paper Co. v. Commissioner, supra, and its progeny, as well as Rev. Rul. 66-299, 1966-2 C.B. 14. Respondent contends that the disputed property items in the subject category are inherently permanent and are identified as a structural component (electric wiring) in section 1.48-1(e)(2), Income Tax Regs. The parties agree that the master television antennae are 5-year property.

We conclude for the reasons discussed supra relating to the branch electrical systems that the branch wiring in the subject category constitutes assets accessory to the conduct of petitioners' healthcare business within the meaning of S. Rept. 1881 supra, 1962-3 C.B. at 722. The disputed property items in the subject category do not relate to the operation or maintenance of the buildings. Consequently, we hold that the wiring and related property in Property Unit 2340 constitute tangible personal property, depreciable over a 5-year recovery period.

    4-5.   Conduit, Floor Boxes, Power Boxes and Outlet Jacks Relating to Telephone Equipment and Electrical Wiring, Conduit, and Connections Relating to Internal Communications Equipment

The telephone equipment in the subject categories (Property Unit 2330) includes conduit installed specifically to house the telephone wiring, telephone floor boxes, telephone power boxes, and telephone outlet jacks, which cannot be used for any purpose other than as a connection point for petitioners' telephones. See supra p. 17. Respondent agrees that those items are required for the use and operation of the telephones in petitioners' hospitals and, during the years in issue, were used only with the telephones and telephone equipment located in the hospitals.

The internal communications equipment in dispute (Property Unit 3090) consists of wiring and conduit, junction boxes, outlets, and sleeves that are necessary for the operation of the

hospital intercom, dictation, paging, and nurse call systems. See supra pp. 17-18. During years ended 1985 through 1988, those items were used only with those particular systems, and the hospital blueprints indicate that the items are to be used specifically with those systems.

Respondent agrees that the telephone enclosures are properly classified as personal property, but contends that the conduit, floor boxes, power boxes, and outlets that are necessary for petitioners to use the telephones and the enclosures constitute structural components of a building. We do not agree.

The electrical connections in the subject categories are necessary for the operation of telephones and internal communications equipment and are used directly with the equipment to which they relate, and, consequently, they are considered a part of that equipment. Scott Paper Co. v. Commissioner, supra; Morrison, Inc. v. Commissioner, T.C. Memo. 1980-129. Accordingly, we hold that the disputed property items in Property Units 230 and 3090 constitute personal property and are depreciable over 5-year periods.

6. Carpeting

The carpeting (Property Unit 2140) was installed in the hospital facilities during construction. See supra p. 18. It was attached to the floors of the hospitals using a general

purpose latex adhesive. Most of the carpeting already has been removed.

Petitioners contend that the carpeting was not a structural component of petitioners' hospital buildings within the meaning of section 1.48-1(e)(2), Income Tax Regs. Petitioners contend that the carpeting was easily removed, its removal did not damage the concrete floors of the hospitals, and that, if necessary, the carpeting could have been reinstalled in other locations with new adhesives. Additionally, petitioners contend that the carpeting was not an integral part of, or a permanent covering for, the hospital floors. Petitioners further contend that section 1.48-1(e)(2), Income Tax Regs., does not list carpeting as a structural component of a building. Accordingly, petitioners contend, the carpeting must be an integral part of, and a permanent covering for, the concrete floors of petitioners' hospitals to constitute a structural component of a building under section 1.48-1(e)(2), Income Tax Regs.

Respondent contends that the carpeting constitutes a structural component. Respondent maintains that the carpet is typical of carpeting used in other business and professional facilities, is custom cut, is attached to the concrete flooring by adhesives, is designed to remain in place until its useful life is exhausted, provides a minimally acceptable floor finish,

would be damaged on removal, and is not reusable except for scrap purposes.

Petitioners counter that the carpeting in all material respects is indistinguishable from the wall-to-wall carpeting installed in guest rooms, office space, bar areas, and dining rooms of a motel described in Rev. Rul. 67-349, 1967-2 C.B. 48. In that Revenue Ruling, respondent ruled that the carpeting was personal property for purposes of section 1.48-1(c), Income Tax Regs., and not a structural component of a building.

The carpeting described in Rev. Rul. 67-349 was fastened with hooks attached to wood strips that were nailed along each wall.  Rev. Rul. 67-349, 1967-2 C.B. at 48.  In holding that the carpeting, installed over concrete floors, constituted personal property, respondent explained:

> The "wall-to wall" carpeting installed in a building in the manner described above is not an integral part of the floor itself, and therefore, the carpeting is not a permanent covering for the floor.  Thus, the "wall-to-wall" carpeting in the instant case is not a "structural component" within the meaning of the regulations.  [Rev. Rul. 67-349, 1967-2 C.B. at 49.]

Respondent contends that the carpeting involved in the instant case is distinguishable from the carpeting described in Rev. Rul. 67-349, supra, because it is more permanent, is installed directly on an unsealed concrete slab by adhesive, and is not reusable.  Petitioners counter that S. Rept. 95-1263, supra, 1978-3 C.B. (Vol. 1) at 415, see supra note 48, expressly

and unequivocally recognized that all carpeting is personal property and is not to be considered a structural component of a building.

Respondent contends, however, that the record does not show that the carpeting involved in the instant case was installed with adhesives designed to ease its removal as was the situation in the example reflected in S. Rept. 95-1263, supra. Respondent relies on Minot Fed. Sav. & Loan Association v. United States, 313 F. Supp. 294, 296 (D.N.D. 1970), affd. 435 F.2d 1368 (8th Cir. 1970), wherein the District Court stated:

> Carpeting is now considered a permanent covering and one of the recognized methods of permanently finishing floors for use. A finished floor, or permanent finished floor covering, is essential for the proper and necessary operation and maintenance of a building.

We conclude that the carpeting involved in the subject category is not materially different from the carpeting described in Rev. Rul. 67-349, supra. We are persuaded from the record that the carpeting is not an integral part of the floor and satisfies the criteria for tangible personal property outlined in Whiteco Indus., Inc. v. Commissioner, 65 T.C. at 672-673. Petitioners have shown that they did not intend for the carpeting to be permanently affixed to the underlying floor and that much of the carpeting already has been removed. The carpeting was attached with adhesives that facilitate ease of removal, and, although the carpeting could have been reused in another

location, it was discarded because of potential health hazards resulting from its placement in hospital buildings.

Respondent's reliance on <u>Minot Fed. Sav. & Loan Association v. United States</u>, <u>supra</u>, is misplaced. Carpeting was not in issue in <u>Minot</u>. In the passage quoted above and cited by respondent, the District Court admonished the Government for taking an inconsistent and contrary position (that removable partitions were structural components) from the principles and rationale of Rev. Rul. 67-349 (that "wall-to-wall" carpeting was tangible personal property). The District Court did not find that carpeting per se constitutes a structural component. The <u>Minot</u> case, furthermore, predates the Senate Finance Committee report for the 1978 Revenue Act wherein carpeting specifically is identified as tangible personal property. S. Rept. 95-1263, 1978-3 C.B. (Vol. 1) at 415.

Based on the foregoing, we hold that the carpeting in the subject category constitutes tangible personal property and that it is depreciable over a 5-year recovery period.

7. <u>Vinyl Wall Coverings</u>

The vinyl wall coverings (Property Unit 2380) in the subject category are the original vinyl wall coverings placed in petitioners' facilities during construction. See <u>supra</u> p. 19.

Petitioners contend that the vinyl wall coverings are not structural components of petitioners' buildings, but are section

1245 class property used in petitioners' businesses and that they are depreciable over 5-year periods.  Respondent contends that the vinyl wall coverings are structural components of the buildings.  Respondent maintains that the vinyl wall coverings are an alternative for paint, they are intended to remain on the walls during the useful life of the wall coverings, and they are not readily removable or reusable.

Section 1.48-1(e)(2), Income Tax Regs., includes as an example of a structural component walls and permanent coverings for them.  Petitioners contend that the vinyl wall coverings are not intended or designed to be either integral parts of, or permanent coverings for, the walls of petitioners' hospitals, but are decorative coverings for those walls.  They are easily removable, and in most instances, due to changes in the decor of the hospitals and heavy wear, the vinyl wall coverings already have been removed without damage to the walls of the hospitals. Petitioners concede that wall coverings typically are not reused in their entirety upon removal, but assert that portions of the vinyl wall coverings could be removed in connection with area repair work and then reattached to the walls.  Petitioners contend that they used adhesives to attach the vinyl wall coverings to the walls, and that method of attachment is expressly recognized as being non-permanent in S. Rept. 95-1263, 1978-3 C.B. (Vol. 1) at 415 (see supra note 48).  Petitioners

contend that the decorative nature of the vinyl wall coverings and the fact that "glue-sizing" was applied to the sheetrock walls prior to placing the wall coverings on the walls also indicate that they were intended to be temporary. Petitioners contend that the vinyl wall coverings are similar to the lattice millwork in issue in Morrison, Inc. v. Commissioner, supra, because they are "merely decorative ornamentation serving no more than an incidental relationship to the operation or maintenance of the building" and "could easily be removed without permanently damaging the * * * walls". Id.

In Standard Oil Co. (Ind.) v. Commissioner, 77 T.C. 349, 405 (1981) (involving the eligibility for ITC of new service station signs and lights), we stated that, for purposes of section 48(a)(1), "all tangible property constitutes 'tangible personal property' unless it is excluded because it is land or an 'inherently permanent structure.'" See also sec. 1.48-1(c), Income Tax Regs. To decide whether the service station signs and lights constituted an inherently permanent structure, we applied the criteria announced in Whiteco Indus., Inc. v. Commissioner, 65 T.C. at 671. Standard Oil Co. (Ind.) v. Commissioner, supra.

Additionally, in Duaine v. Commissioner, T.C. Memo. 1985-39, for the purpose of deciding whether wall and floor tiles in a building leased to a fast food restaurant constituted inherently permanent structures, we applied the Whiteco criteria. In

Duaine, we held that, because the tiles were glued to the surfaces on which they were installed and because a building's interior tiling was included specifically as a structural component in section 1.48-1(e)(2), Income Tax Regs., the tiles were a permanent covering for the restaurant's walls and floors. Id.

In contrast, we are persuaded that the vinyl wall coverings involved in the subject category were not intended to be, and were not, a permanent covering for the hospital walls. The walls were prepared with glue sizing to permit easy removal of the vinyl wall coverings without damage to the walls. The vinyl wall coverings were attached with adhesives that also permitted easy removal. Indeed, much of the wall coverings was removed within 8 years of installation without significant damage to the walls or to the wall coverings.

Accordingly, we hold that the vinyl wall coverings in the subject category constitute tangible personal property, and that they are depreciable over a 5-year recovery period.

8. Vinyl Floor Coverings

The vinyl floor coverings and matching base cove molding (Property Unit 2370) in the subject category are the floor coverings originally placed in petitioners' hospital facilities during construction. See supra pp. 20-21.

Petitioners contend that the vinyl floor coverings are not an integral part of their buildings' floors, and, consequently, they are not structural components but are section 1245 class property depreciable over 5-year periods pursuant to S. Rept. 95-1263, supra. Petitioners contend that the floor coverings are attached to the concrete floors using general purpose latex adhesives so that they are not permanently affixed but are easily removed without damage to the underlying floors, that petitioners typically remove the vinyl floor coverings every 3 to 10 years, and that most of the vinyl floor coverings in issue have been removed already. Petitioners further contend that the sheet vinyl floor covering is a type of floor covering peculiar to hospitals or other health care organizations, and that it is section 1245 class property also because of its unusual nature. See Scott Paper Co. v. Commissioner, 74 T.C. at 183.

Respondent contends that the vinyl floor coverings are structural components of the buildings to which they relate because the flooring coverings are custom cut, not readily removable, not reusable, typical of floorings used in other business and professional facilities, attached to the concrete flooring by adhesives, and designed to remain in place until their useful lives are exhausted.

The term "structural components" includes floors and any permanent coverings for them. Sec. 1.48-1(e)(2), Income Tax

Regs. S. Rept. 95-1263, supra, 1978-3 C.B. (Vol. 1) at 415,

however, identifies as personal property

> floor coverings which are not an integral part of the floor itself such as floor tile generally installed in a manner to be readily removed (that is it is not cemented, mudded, or otherwise permanently affixed to the building floor but, instead, has adhesives applied which are designed to ease its removal), * * *.

Applying the Whiteco criteria, we conclude that the vinyl

floor coverings are not inherently permanent. We are persuaded

that the floor coverings were not intended to be, and were not,

permanent coverings for the buildings' floors. The floor

coverings were attached with adhesives to permit easy removal

without damage to the concrete floors. Indeed, much of the floor

coverings was removed within 3 to 5 years of their installation

without damaging the underlying floors or vinyl floor coverings.

Accordingly, we hold that the vinyl floor coverings

constitute tangible personal property, and that they are

depreciable over a 5-year recovery period.

9-10. Kitchen Water Piping, Kitchen Equipment Steam Lines, and Special X-Ray Plumbing Connections

The kitchen water piping (Property Unit 3080) in the subject

category consists of the kitchen grease waste systems (or the

grease trap system) and plumbing connections serving specific

items of kitchen equipment. See supra pp. 21-23. The plumbing

connections branch off from a hospital's main water lines and

supply water directly to specific items of equipment located in

petitioners' kitchens, such as the dishwashers, coffee urns, steam kettles, braising pans, and ice makers, they are necessary for the operation of the kitchen equipment and are used solely with the items of equipment to which they relate. The kitchen equipment steam lines (Property Unit 3070), are identical to the kitchen plumbing connections. The special plumbing connections for the x-ray equipment (Property Unit 2244) are required for the operation and use of the x-ray equipment and are used only with that equipment. See supra pp. 22-23.

Petitioners contend that the kitchen water piping, the kitchen equipment steam lines, and the x-ray equipment special plumbing connections constitute personal property, depreciable over 5-year periods. Petitioners maintain that those disputed property items do not relate to the operation or maintenance of a building because of their relationship with the kitchen or x-ray equipment. They also contend that most commercial buildings do not have kitchen grease waste systems, which are directly related to petitioners' food preparation activities. In support of their contentions, petitioners rely on Scott Paper Co. v. Commissioner, supra; Morrison, Inc. v. Commissioner, supra; Duaine v. Commissioner, supra; Texas Instruments, Inc. v. Commissioner, supra; Central Citrus Co. v. Commissioner, supra; and Rev. Rul. 66-299, 1966-2 C.B. 14. Petitioners contend that our reasoning in Morrison, Inc. v. Commissioner, supra, wherein we found that

the kitchen drainage system and kitchen water piping constituted personal property, is squarely applicable to the instant case.

Respondent contends that the disputed property items are structural components. Respondent agrees that the disputed property items are factually similar to property items involved in Morrison, Inc. v. Commissioner, supra. Respondent asserts, however, that in Morrison the taxpayers had argued that the kitchen water piping was eligible for ITC as "other tangible property". Respondent contends that a holding that the disputed property items are "other tangible property" would result in those items constituting section 1250(c) property because petitioners are not involved in an activity enumerated in section 1245(a)(3)(B). Respondent additionally maintains that the disputed property items are not unique to hospitals.

The terms "plumbing and plumbing fixtures" are listed specifically in section 1.48-1(e)(2), Income Tax Regs., as constituting structural components of a building. Nonetheless, in Morrison, Inc. v. Commissioner, supra, we focused on the use of the kitchen drains and concluded that the kitchen drainage system did not relate to the operation or maintenance of a building but rather constituted personal property because it directly serviced the taxpayers' equipment and machinery. Similarly, we concluded that the cafeterias' kitchen water piping was necessary to and used directly with specific pieces of

equipment and consequently did not relate to general building plumbing.  Id.; see also Texas Instruments, Inc. v. Commissioner, supra; Duaine v. Commissioner, supra.  The facts in the instant case relating to the disputed property items in the subject categories are not materially distinguishable from the facts in Morrison, Inc. v. Commissioner, supra, and Duaine v. Commissioner, supra.

The disputed property items in the subject categories relate to the operation of specialized kitchen or hospital equipment. That equipment is related to petitioners' business of providing healthcare services.  As such, the disputed property items are assets accessory to petitioners' business and, consequently, they do not constitute structural components of the buildings.  E.g., Scott Paper Co. v. Commissioner, supra; Morrison, Inc. v. Commissioner, supra; Duaine v. Commissioner, supra; Texas Instruments, Inc. v. Commissioner, supra; Central Citrus Co. v. Commissioner, supra.

Accordingly, we hold that the kitchen water piping, kitchen equipment steam lines, and special x-ray plumbing connections are personal property, and that they are depreciable over 5-year recovery periods.

11.  Kitchen Hoods and Exhaust Systems

Kitchen exhaust hoods, exhaust fans, supply air intake fans and related duct work, and dishwasher condensate return units constitute Property Unit 3085.  See supra pp. 23-25.  The exhaust

hoods and exhaust systems dissipate air and smoke produced by the ranges and cooking equipment located in the kitchens, ventilate the air in the kitchen areas of petitioners' hospitals in order to ensure the proper operation of petitioners' kitchen equipment, replace the air expelled from the kitchens, and remove steam and humidity expelled by petitioners' kitchen dishwashers in order to keep the dishwashers operating properly. The kitchen hoods and exhaust systems do not serve to ventilate areas of the hospitals other than the kitchen areas. The dishwasher exhaust fans and related duct work operate solely to exhaust steam and other vapors from the dishwashers. The dishwasher condensate return units are dedicated solely to providing emergency hot water for the hospital dishwashers. The piping is attached to the hospital buildings and runs directly from a dishwasher to a boiler and back to the dishwasher.

Petitioners contend that the disputed property items in the subject category are not structural components of a building, but are section 1245 class property, depreciable over 5-year periods. Petitioners maintain that removal of the disputed property items would not affect the hospitals' main water piping or sanitary drainage. Petitioners contend that those items do not relate to general building plumbing and thus do not relate to the operation or maintenance of a building. Petitioners rely on the "sole justification" test of section 1.48-1(e)(2), Income Tax Regs., to support their contention that the kitchen hoods and exhaust

systems and the dishwasher condensate return units constitute personal property within the meaning of section 1.48-1(c), Income Tax Regs., and therefore of section 1.1245-3(b), Income Tax Regs.

Respondent contends that the disputed property items are structural components of the buildings to which they relate. Respondent contends that the items are not unique to hospitals, are adaptable to other uses, are securely attached to the building structure, and provide more than incidental benefit and comfort to petitioners' kitchen employees. Specifically, respondent contends that the dishwasher condensate return unit is more closely related to the boiler than the dishwasher.

In Morrison, Inc. v. Commissioner, T.C. Memo. 1986-129, we held that the cafeterias' kitchen air ventilation system constituted personal property, based on the "sole justification" test of section 1.48-1(e)(2), Income Tax Regs. Respondent agrees that the kitchen hoods and exhaust systems, but not the dishwasher condensate return unit, are very similar to items involved in Morrison.

For the reasons previously discussed in Morrison, Inc. v. Commissioner, supra, we agree with petitioners that the kitchen hoods and exhaust systems, as well as the dishwasher condensate return units, satisfy the "sole justification" test of section 1.48-1(e)(2), Income Tax Regs. The evidence presented by petitioners establishes that the kitchen hoods and exhaust systems were installed only to meet temperature or humidity

requirements essential for the operation of petitioners' kitchen equipment and they provide only incidental benefit to petitioners' employees.  The dishwasher condensate return units and related piping were installed solely to provide emergency hot water for petitioners' dishwasher equipment.  The disputed property items in the subject category consequently do not constitute structural components of petitioners' buildings. Morrison, Inc. v. Commissioner, supra; Duaine v. Commissioner, supra; sec. 1.48-1(e)(2), Income Tax Regs.

Accordingly, we hold that the disputed property items in the subject category constitute personal property, and that they are depreciable over 5-year recovery periods.

12.  Patient Corridor Handrails

Patient corridor handrails (Property Unit 3190) are handrails placed along the patient corridors of petitioners' hospital facilities to assist patients.  See supra pp. 25-26. The handrails can be removed from the walls by removing the bolts holding them in place, and their removal would not damage the hospital walls.  In some instances, the handrails have been removed.

Petitioners contend that the patient corridor handrails constitute section 1245 class property, depreciable over 5-year periods.  Additionally, petitioners contend that the disputed property items in the subject category are peculiar to hospitals and other medical facilities and that they do not relate to the

operation or maintenance of the buildings. Petitioners further contend that the patient corridor handrails are analogous to the vault doors, record vault doors, night depository facilities, and walk-up and drive-up teller's windows that, in Rev. Rul. 65-79, 1965-1 C.B. 26, constituted personal property within the meaning of section 1.48-1(c), Income Tax Regs., because the items were accessory to the banking business. Petitioners contend that patient corridor handrails are clearly distinguishable from bumper guards which are used to protect the hospital walls and which have been treated as relating to the operation of petitioners' buildings. Petitioners contend further that the patient corridor handrails are reusable.

Respondent contends that the patient corridor handrails are structural components because they relate to the operation and maintenance of the hospital buildings. Respondent agrees that the handrails are removable but asserts that they generally are not reusable. Respondent does not agree that the patient corridor handrails relate to the provision of healthcare services. Respondent asserts that they protect walls, similar to bumper guards, and provide support for anyone needing it, similar to handrails in stairwells.

Section 1.48-1(c), Income Tax Regs., provides that all items contained in or attached to a building constitute personal property, unless they constitute structural components of a building. Section 1.48-1(e)(2), Income Tax Regs., provides that,

for a property item to constitute a structural component of a building, it must relate to "the operation or maintenance of a building." In Scott Paper Co. v. Commissioner, 74 T.C. at 183, we stated that "Items which occur in an unusual circumstance and do not relate to the operation or maintenance of a building" are not structural components of a building. Moreover, assets that are accessory to a business constitute tangible personal property. Metro Natl. Corp. v. Commissioner, T.C. Memo. 1987-38; S. Rept. 1881, supra, 1962-3 C.B. at 722.

We are persuaded that the patient handrails are placed in patient corridors to aid hospital patients who might need support and that they are not intended to function as wall protectors. We conclude that the handrails are assets accessory to petitioners' business of providing healthcare services within the meaning of S. Rept. 1881, supra, 1962-3 C.B. at 722. Consequently, we hold that the handrails do not constitute structural components and that the patient corridor handrails therefore constitute personal property that must be depreciated over 5-year recovery periods.

13. Overbed Lights and Related Electrical Connections

The overbed lights (Property Unit 4050) in the subject category are fluorescent light fixtures placed directly over the patient beds. See supra pp. 26-27. The lights are activated from the bedside by a doctor, nurse, or other hospital employee in connection with examining, bathing, or preparing a patient for

surgery.  General reading lights, vanity lights, night lights, and large double-pane windows provide other illumination for the patient rooms.

Petitioners contend that the overbed lights are not structural components of their buildings, but that they are section 1245 class property, depreciable over 5-year recovery periods.  Petitioners assert that the overbed lights are not intended or designed to be used for basic patient room illumination, they are used solely by doctors, nurses, and staff in examining patients and providing health care services, and that they are accessory to petitioners' businesses.  Petitioners further contend that the overbed lights fit the description of special lighting delineated in S. Rept. 95-1263, supra, 1978-3 C.B. (Vol. 1) at 415, and, therefore, the overbed lights constitute section 1245 class property.

Respondent contends that the overbed lights are structural components of the buildings to which they relate.  Respondent also contends that the overbed lights are permanently installed in the ceiling of the buildings, provide general room illumination, and are identical to other fluorescent lights in the hospital buildings.  Additionally, respondent disputes petitioners' assertion that the overbed lights are used exclusively by healthcare professionals.

Section 1.48-1(e)(2), Income Tax Regs., includes "electric wiring and lighting fixtures" as an example of a structural

component. Nonetheless, in S. Rept. 95-1263 (see supra note 48) Congress recognized that "special lighting" which has no more than an incidental relationship to the operation or maintenance of a building constitutes personal property. E.g., Metro Natl. Corp. v. Commissioner, supra (decorative lighting and plant grow lights). Lighting which serves as an accessory to a business also constitutes personal property. Id. (security lighting illuminating the outside perimeter of a building housing a psychiatric facility). In Morrison v. Commissioner, T.C. Memo. 1986-129, we held that the taxpayers' emergency lighting constituted personal property and noted that lighting fixtures and electrical connections that "do not provide basic illumination" and that are "accessory to a business" do not constitute structural components of a building. Id.

Respondent contends that the overbed lights are not similar to the emergency lights involved in Morrison, Inc. v. Commissioner, but are ordinary fluorescent fixtures which provide general room illumination. We agree.

We are not persuaded that the overbed lights are "special lighting" within the meaning of S. Rept. 95-1263, supra, 1978-3 C.B. (Vol. 1) at 415, or that they constitute an asset accessory to a business within the meaning of S. Rept. 1881, supra, 1962-3 C.B. at 722. The overbed lights are standard 4-tube florescent light fixtures placed in the acoustical ceilings of the hospital buildings. Photographs contained in the record reveal that the

overbed lights provide basic room illumination and have more than an incidental relationship to the operation or maintenance of petitioners' buildings.  There is no indication in the record that petitioners intended the overbed lights to be temporary.  In our view, removal of the light fixtures would affect the integrity of the building.

Accordingly, we hold that the overbed lights are structural components of the buildings which constitute section 1250 class property, and that, consequently, they are depreciable over the same recovery periods as the buildings to which they relate.

14.  Partitions

The partitions (Property Unit Number 3240) in the subject category are accordion-style room dividers placed in conference rooms or cafeterias on tracks attached to the ceilings of petitioners' hospitals.  See supra pp. 27-28.  They are used to divide areas of large rooms into smaller areas where conferences and luncheons are held.  The partitions are manufactured on assembly lines and are available as catalog items from manufacturers.  None of the partitions bears any structural load. The partitions are removable and at least one of them has been removed from one of petitioners' hospital facilities and is currently in storage.  Removal of the partitions does not affect the essential structure of the hospital buildings.

Petitioners contend that the partitions do not constitute structural components of the buildings to which they relate

because they are not permanent and are not an integral part of the building structure but constitute personal property, depreciable over 5-year periods. Petitioners contend that the partitions are similar to the decorative lattice millwork in Morrison, Inc. v. Commissioner, supra, and the movable partitions in Minot Fed. Sav. & Loan Association v. United States, 435 F.2d 1368 (8th Cir. 1970), and King Radio Corp. v. United States, 486 F.2d 1091 (10th Cir. 1973), which were held to constitute section 1245 class property.

Respondent contends that the partitions are structural components. Respondent maintains that, because the disputed property items are not easily reusable because of the substantial support system they require, the partitions are factually distinguishable from the partitions involved in Morrison, Inc. v. Commissioner, supra, Minot Fed. Sav. & Loan Association v. United States, supra, and King Radio Corp., Inc. v. United States, supra. We do not agree.

The words "partitions" and "doors" are listed in section 1.48-1(e)(2), Income Tax Regs., as items that generally constitute structural components of a building. Nonetheless, in Morrison, Inc. v. Commissioner, supra, we stated that doors constitute a structural component of a building "only if they are a permanent part of the * * * building, so that their removal would affect the essential structure of the building." Relying on S. Rept. 95-1263, supra, 1978-3 C.B. (Vol. 1) at 415, we found

that decorative lattice millwork in the taxpayers' restaurants, which served to separate the customer serving line from the dining portions of the cafeteria and which was not used to provide structural support for the cafeteria's ceiling, was personal property because "The lattice millwork could easily be removed without permanently damaging the underlying ceiling or walls". Morrison, Inc. v. Commissioner, supra.

We are persuaded that the partitions in the subject category are not inherently permanent. The partitions are designed to subdivide cafeterias and conference rooms into smaller eating or meeting space. They provide no structural support for the ceilings or walls. The partitions are capable of being moved, and have been removed, without damage to the building or to the partitions. Their removal would not affect the operation or maintenance of the buildings. The partitions have no more than an "incidental relationship" to the overall operation or maintenance of the buildings. Morrison, Inc. v. Commissioner, supra; S. Rept. 95-1263 supra, 1978-3 C.B. (Vol. 1) at 415. But cf. Texas Instruments, Inc. v. Commissioner, T.C. Memo. 1992-306 (window walls were structural components); L.L. Bean, Inc. v. Commissioner, T.C. Memo. 1997-175 (storage rack systems were structural components).

Accordingly, we hold that the partitions are personal property, and that they have a 5-year recovery period.

15.  Patient Bathroom Accessories and Plastic Mirrors

Bathroom accessories (Property Unit 2360) and plastic mirrors (Property Unit 2385) in the subject category include soap dispensers, mirrors, towel racks, grab bars, toilet paper holders, bathrobe hooks, shower curtain rods, and toiletry shelves, contained in the patient room bathrooms[50] of petitioners' hospital facilities.  See supra pp. 28-29.  The accessories are movable and removable.

Petitioners contend that accessories located in patient room bathrooms are an integral part of petitioners' provision of healthcare services to their patients and are not related to the overall operation or maintenance of a building but constitute section 1245 class property, depreciable over 5-year periods. Petitioners assert that the bathrooms are designed specifically to be used only by petitioners' patients, and that they are in addition to the public bathrooms and the employee bathrooms that are contained in most types of buildings and which are necessary for the operation of the buildings.

 Petitioners maintain that the bathrooms and related bathroom accessories are an accessory to the hospital business because hospitals and other health care organizations must provide each patient with access to a bathroom without having to enter the

_____

[50]    Petitioners concede that bathroom accessories located in employee, staff, and visitor rest rooms relate to the operation or maintenance of petitioners' buildings.

general patient corridor area. Petitioners rely on Scott Paper Co. v. Commissioner, 74 T.C. at 183, in support of their contention that the disputed property items do not relate to the operation or maintenance of a building and should not be considered structural components because the bathroom accessories are items which occur in an unusual circumstance.

Respondent contends that the bathroom accessories constitute structural components of the buildings to which they relate. Respondent asserts that the bathroom accessories are permanent, designed to remain in place for their useful lives, and are not economically reusable if they are removed. Respondent contends that the number of bathrooms or type of people who utilize the bathroom accessory does not change the nature of the disputed property items. Respondent denies that the patient bathroom accessories occur in unusual circumstances, pointing to hotels, motels, and apartment buildings that also contain a large number of bathrooms in comparison to the number of bathrooms contained in typical office buildings.

Although we agree with petitioners that most office buildings do not contain one bathroom for each one-to-two persons who will be served by the business conducted within the building, we do not agree that the large number of patient bathrooms serve a function unique to petitioners' business or that they are assets accessory to the business of providing healthcare

services.  See Morrison, Inc. v. Commissioner, supra, where we found that restroom accessories such as vanity cabinets and counters, even though required by local occupancy codes to be greater in number than other business buildings, were not accessory to the taxpayers' restaurant business but constituted structural components of a building.

We conclude that the bathroom accessories constitute structural components of the buildings.  Although capable of being removed and reused, there is no evidence that at the time they were installed petitioners ever intended to remove and reuse the bathroom accessories.  We are persuaded that the bathroom accessories are and were intended to be a permanent part of the buildings.  The bathroom accessories also serve a function that is more than incidental to the operation of the building.

Accordingly, we hold that the bathroom accessories are structural components of the buildings to which they relate and therefore constitute section 1250 class property, and that they are depreciable over the same recovery period as the buildings.

16.  Acoustical Ceilings

Acoustical ceiling tiles and related grid work in petitioners' hospitals comprise Property Unit 2260.  See supra pp. 29-30.  The acoustical ceilings are movable and removable, and their removal does not damage the building structure.

Petitioners contend that the acoustical ceilings are not structural components of petitioners' hospital buildings, but constitute section 1245 class property, depreciable over 5-year periods. Petitioners assert that the acoustical ceilings serve needs peculiar to the operation of their hospital businesses because they prevent dust and dirt particles that accumulate on the duct work and pipes located between the acoustical ceilings and the structural ceilings of petitioners' hospitals from falling into the areas below, and that they also absorb sound.

Respondent contends that the acoustical ceilings are structural components. Respondent maintains that the acoustical ceilings are virtually identical to the acoustical ceilings involved in <u>Metro Natl. Corp. v. Commissioner</u>, T.C. Memo. 1987-38, and <u>Texas Instruments, Inc. v. Commissioner</u>, <u>supra</u>, which we found constituted structural components.

Section 1.48-1(e)(2), Income Tax Regs., includes ceilings as examples of structural components. We recognized in <u>Morrison, Inc. v. Commissioner</u>, <u>supra</u>, however, that the reference to ceilings in the regulation means inherently permanent ceilings.

Petitioners contend that, because the acoustical ceilings in those cases did not serve the taxpayer's particular business needs, the facts in the instant case are distinguishable from those involved in <u>Metro Natl. Corp. v. Commissioner</u>, <u>supra</u>, and <u>Texas Instruments, Inc. v. Commissioner</u>, T.C. Memo. 1992-306.

Petitioners maintain that the acoustical ceilings involved in the subject category are analogous to the vault doors, walk-up and drive-up teller's windows, and teller's booth installed by a bank which respondent held constituted tangible personal property within the meaning of section 1.48-1(c), Income Tax Regs., because their removal would not affect the continued operation of the bank building as a building, even though their removal would necessitate making repairs to the building and could affect the continued operation of the bank's business.  Rev. Rul. 65-79, 1965-1 C.B. 26.

We conclude that the acoustical ceilings are not materially distinguishable from the false ceilings described in Metro Natl. Corp. v. Commissioner, supra, or the suspended ceilings depicted in Texas Instruments, Inc. v. Commissioner, supra.  Movability is only one characteristic to be considered in determining whether property is a structural component.  Everhart v. Commissioner, 61 T.C. 328, 331 (1973).  We are persuaded that the acoustical ceilings were designed and intended to be a permanent part of the buildings and that their removal would affect the operation of the buildings in which they were installed.  We do not think that the incidental benefit of trapping some dust and dirt and providing sound reduction is sufficient to convert the ceilings into assets accessory to petitioners' healthcare business as petitioners contend they are.  The acoustical ceilings serve a

function that is more than incidental to the operation and maintenance of the buildings.

Accordingly, we hold that the acoustical ceilings are structural components of petitioners' buildings and therefore constitute section 1250 class property and that they are depreciable over the same recovery periods as the buildings to which they relate.

17.  Steam Boilers and Related Accessories

The steam boilers and the related accessories (Property Unit 3193) in the subject category provide heat for petitioners' buildings and provide high-pressure steam essential to the operation of particular items of equipment located in petitioners' hospital facilities, such as humidifiers, air make-up units, and central sterilization equipment.  See supra p. 31.

Petitioners contend that the boilers are personal property, depreciable over 5-year periods.  Petitioners assert that production of high-pressure steam necessary for the operation of the hospitals' sterilizers and humidifiers is the primary reason for the boiler's existence, and that heating the building is an incidental function.  Accordingly, petitioners contend, the boilers satisfy the "sole justification" test of section 1.48-1(e), Income Tax Regs.

Respondent contends that the boilers and accessories are components of a heating system and thus constitute structural

components because they relate to the operation or maintenance of the hospital buildings.  Respondent maintains that the boilers are designed to generate hot water and pressurized steam primarily for heating purposes and secondarily for use in various hospital equipment.  Respondent also asserts that the boilers are not removable or reusable.

Section 1.48-1(e)(2), Income Tax Regs., includes as an example of a structural component "all components (whether in, on, or adjacent to the building) of a * * * heating system, including motors, compressors, pipes and ducts."  Specifically excluded, however, is "machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery * * *".  Id.

Petitioners contend that the steam boilers are, in all material respects, the same as the boiler facility analyzed in Rev. Rul. 70-160, 1970-1 C.B. 7.  In that ruling, a furniture manufacturer constructed a separate boiler facility to produce steam for use directly in the furniture manufacturing process, for heating make-up air needed to maintain proper humidity and temperature conditions in the machine, veneer, and cabinet room areas of the factory, and for incidental heating of other areas of the main factory and adjacent buildings.  Id.  Respondent ruled that the boiler facility (excluding the building)

constituted personal property because it satisfied the "sole justification" test inasmuch as the boiler facility was "designed, constructed, and operated for the essential purpose and primary function of steam production, in order to furnish additional air, and to provide the required temperature and humidity requirements essential in the manufacture of the furniture."  Id. at 8.  Respondent contends that Rev. Rul. 70-160 is inapposite because heating the buildings was the primary purpose for the boilers.

We are not persuaded that the boilers in the subject category were designed, constructed, and operated solely to provide steam for the operation of petitioners' hospital equipment and that heating the buildings is merely an incidental function of the boilers.  We also do not agree with respondent that producing high-pressure steam for petitioners' equipment is an incidental function of the boilers.  Based on the record, we conclude that the boilers were installed to, and did, serve dual functions.  There is no evidence that petitioners had any other heating system for their building outside of the subject boilers. Heat is essential for the operation of buildings.  However, we also are convinced that high-pressure steam is essential for the operation of certain hospital equipment.  Under the circumstances present in the instant case, we find that both providing heat for the buildings and providing high-pressure steam for the hospital

equipment are essential functions of the boilers, and that neither function is incidental to the other. Accordingly, the "sole justification" test is not satisfied. See sec. 1.48-1(e)(2), Income Tax Regs.

Based on the foregoing, we conclude that the boilers are analogous to the electrical distribution system involved in Scott Paper Co. v. Commissioner, 74 T.C. 137 (1980). The record, however, does not demonstrate the percentage of the steam produced by the boilers that is used to operate hospital equipment. Consequently, we have no "logical and objective measure" of the portion of the boilers that would constitute section 1245 personal property. See Scott Paper Co. v. Commissioner, supra at 165. Accordingly, we sustain respondent's determination that the boilers must be depreciated over the same period as the buildings to which they relate.

To reflect the foregoing,

Appropriate orders
will be issued.